### In re WESTMINSTER ASSOCIATES, LTD., Debtor.

### Westminster Associates, Ltd., Plaintiff,

### v.

### Orkin Exterminating Co., Inc., Defendant.

### Bankruptcy No. 98–05116–3P1. Adversary No. 00–134.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Sept. 30, 2002.

John B. Macdonald, Jacksonville, FL, for defendant.

Richard R. Thames, Jacksonville, FL, for plaintiff.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This proceeding is before the Court upon the Complaint of Plaintiff, Westminster Associates, Ltd., seeking damages against Defendant, Orkin Exterminating Company, Inc., arising from (i) Defendant's failure to properly protect the Plaintiff's apartment complex from subterranean termites, and (ii) Defendant's failure to honor the repair guarantees which it issued to Plaintiff.

Upon the evidence presented, the Court makes the following findings of fact and conclusions of law: [1]

### Findings of Fact

1. Plaintiff is the owner of a 216 unit apartment complex located at 7350 Blanding Boulevard which consists of 22 residential buildings, a clubhouse, two tennis courts and a pool area (T20). The buildings are wood frame over a monolithic slab.

2. In February of 1977, Defendant was hired to protect the apartment complex from subterranean termites (T38). The parties entered into 23 Subterranean Termite Agreements (Agreements), and Defendant provided Plaintiff with 23 Lifetime Termite Damage Guarantees (Guarantees) pursuant to the Agreements (T39).

3. Defendant's employee, Lee Henry, conducted an inspection of the property prior to the February 1977 contracting. He prepared a graph showing pre-existing termite activity in the corner of one building (T702, 865, P41).

4. In 1982, U.S. Shelter Corporation sold the Plaintiff apartment complex to Westminster Associates Limited. A wood destroying organism report was required in connection with the proposed sale, and Defendant was called upon to conduct the inspection. The inspection, conducted by the same Lee Henry who graphed the property 5 years prior, revealed the existence of live subterranean termites or ter-

---

**1.** This Court's job was made more difficult and time consuming because both parties misrepresented the evidence when citing to the transcript.

mite damage in 17 of the 23 buildings, and the presence of moisture causing conditions throughout the complex (P11). Henry reported:

> As you can see by this report, the apartment complex has a lot of moisture. This is caused by the fact that when it rains, water penetrates through the stucco walls. The water also runs off the roof onto the upper patios and where the concrete has cracked, it seeps into the roof area of the utility and storage rooms, causing extensive moisture rot. As long as this problem exists, it is impossible to control subterranean termites. (P11).

5. Testimony was received that the Defendant later "cleared" the property (presumably after the above mentioned problems had been remedied by the seller) which allowed the sale to proceed (T498, 523, 529).[2] Mark Werner, the purchaser of the complex, testified that he would not have closed the transaction without Defendant's clearance (T497–498, 529).

6. Following the 1982 transaction, Defendant continued to invoice Plaintiff for renewal of the Guarantees, and Plaintiff routinely paid for the renewals (T594–595). In addition, Defendant inspected the property annually from at least 1977 to 1999 and prepared inspection reports following each visit (P28–40). According to Defendant, the purpose of the annual inspections was to "help us ensure your current protection remains effective" (P21). The inspection reports were typically sent to Plaintiff with the invoices for renewal of the Guarantees. There was never any indication on the invoices or inspection reports that there was a persistent termite problem on the property or any problem with the property's condition (P28–40). In fact, a review of the reports shows that "none" was routinely checked or circled in the section called "Evidence [of termites] Found."

7. Regardless, termite swarms occasionally appeared on the property; Defendant was called and the infestation was treated (T514–515, 517–519, 570, 611–612, 960, 981). Plaintiff produced witnesses that testified that Defendant never notified the owner that there was a *continuing* termite infestation at the apartment complex. (T497–502, 512, 667, 981). The Defendant's reports—stating it found no continuing evidence of termites—back up this assertion.

8. By the late 1990s, HUD, the first mortgage holder, issued several deficiency reports requiring that certain items of maintenance be immediately addressed at the complex (D31, 36). The complex also received several citations from the State of Florida and the City of Jacksonville for building code violations (D60, 62). The owner of the property testified that the problems noted by HUD, the state, and the City were all timely addressed and cured (T553, 611).

9. In late 1996, the owner of complex determined that it needed a complete overhaul. Building 4 (sometimes referred to as Building 5) was chosen as a prototype for the remodeling, and renovations to that building commenced in 1997 (T572). During the course of the renovation, some termite damaged wood was discovered and replaced (T514). Defendant was subsequently called to treat the building and to provide a price for retreating the entire complex, if needed, after the planned remodeling took place. After observing the remodeled Building 4, Defendant quoted $13,502 to retreat the entire complex, and made several suggestions for preserving the termite barrier should the property be

---

**2.** The actual clearance letter or second WDO Report was not entered into evidence.

retreated (T515–516, P12). Defendant did not, however, advise the Plaintiff that the current conditions at the complex or the remodeling of Building 4 would in any way void the repair bonds (P12).

10. In 1998, the first mortgage holder declared a default under the loan documents and initiated administrative foreclosure proceedings (D34). On June 25, 1998, Plaintiff filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

11. During the course of the reorganization, Plaintiff was able to locate two investors, Forrest Bowen and Terrell Rhye, who had the resources to renovate the property and refinance the mortgage. Bowen, Rhye, and Werner prepared a plan for renovating the property, and obtained various quotes for the accomplishment of the renovations. This renovation plan, which contemplated $759,000 in exterior improvements, is described in the Plaintiff's disclosure statement and included painting, stucco and wood repair, vinyl siding, new landscaping, gutter replacements, additional lighting, and new fencing around the pool and tennis courts (P19). The plan did not include removal of the stucco from the buildings or significant structural repairs (T28). The plan contemplated that the buildings would be surfaced with vinyl.

12. Renovations on the property commenced during the Chapter 11 case and prior to confirmation of Plaintiff's plan of reorganization. Extensive termite damage was discovered in Building 1 and Defendant was contacted. Defendant visited the property briefly, but evidently failed to take any further action (T46, P23).

13. After discovering extensive termite damage in several more buildings, Plaintiff decided that it was more cost effective to strip the stucco finish from all of the buildings as the work progressed so that the full extent of the wood damage could be observed and remedied (T48–49, 1019). Evidently, Defendant was invited to be present during the entire renovation, but declined (T24, 46–47, 215–216).

14. Plaintiff hired an entomologist, Dr. Maxi P. Nolan, III, to be present on site as the repairs progressed. Dr. Nolan and his assistant spent 400–500 hours over 18–24 months observing the renovations and sampling damaged wood as it was replaced (T211). According to Dr. Nolan, the termite infestation at Plaintiff's complex was "the worst he had ever seen" in his 17 years of studying termites (T214–215, 1083–1084).

15. Defendant sent its expert entomologist, Dr. Joseph Maulden, to inspect the property. Dr. Maulden spent a little over 3 hours on the property observing one "open" building (Building 15) and another building which was nearing completion (Building 18) (T751–752).

16. Termite damage was found in all of the buildings at the complex, with the exception of the clubhouse (P26).

17. Plaintiff alleges that the total cost of remediating the termite infestation and wood damage was $2,578,105.89 (P17). Plaintiff alleges it also suffered $160,132 in lost revenues due to tenant relocation during the remediation process (P13), and an additional $328,367 in costs directly related to Defendant's "dereliction of duty." Thus, Plaintiff seeks damages in the amount of $2,913,274.65

18. Plaintiff's plan of reorganization was confirmed on August 30, 1999.

### Conclusions of Law

Plaintiff asserts that the presence of termites throughout the apartment complex is in and of itself is prima facie evidence that Defendant failed to properly protect Plaintiff's apartment complex from

subterranean termites. Plaintiff argues that Defendant's failure was three-fold: (1) that it failed to lay a proper termite barrier around the perimeters of each building; (2) that it failed to treat the property for subterranean termites after the initial application, and; (3) that Defendant failed to make adequate investigations each year when it inspected the property. Plaintiff contends that Defendant's breach of these obligations proximately caused the termite damage on the property. Plaintiff also argues that Defendant breached its contractual obligation to repair the damage.

Defendant argues that it is relieved of liability because: (1) Plaintiff's routine replacement of shrubbery and air conditioning units around the apartment units over a 25 year period effectively destroyed the termite barrier it installed; (2) plumbing repairs and slab leaks over 25 years compromised the barrier; (3) the barrier was compromised because soil accumulated around the base of the buildings; (4) trees and tree roots grew near the buildings also decreasing the effectiveness of its treatments, and; (5) there was stucco to ground contact around the buildings and that contact concealed termite problems.

This Court finds that, had Defendant been properly inspecting and retreating the property prior to 1999, the termite infestation and reasons for it could have been addressed at a much earlier point and the consequential damages minimized. Further, Defendant could have refused to renew coverage after any of the annual inspections but failed to do so. Thus, Defendant's initial arguments regarding liability fail.

### Liability disclaimers contained in Agreements

Next, the Defendant argues that it cannot be found liable because of numerous disclaimers and liability limitations which are printed on the back of the Agreements. However, a Florida Statute prevents Defendant from making this argument as it applies to those disclaimers.

### Relevant Florida Statute

In 1982, the Florida legislature enacted § 482.227(2), Florida Statutes, to protect consumers from hidden disclaimers in pest control contracts. The statute provides:

A disclaimer indicating that no guarantee or warranty is offered under the contract must appear in conspicuous type on the face of the contract.

Plaintiff argues that Defendant's Agreements do not comply with this statute because the disclaimers in this case do not appear in conspicuous type, nor on the face of the Agreement and thus are unenforceable as a matter of law.

Defendant has argued, however, that the statute is inapplicable to the subject Agreement because § 482.227(2) was not enacted until 1982, five years after the initial Agreement was signed, and because to find otherwise would impair an existing contractual obligation.

Plaintiff counters that a new contract was formed each time the Agreement was renewed. To bolster this argument, Plaintiff submits case law regarding the renewal of insurance policies. Where a statute affecting insurance coverage is enacted after the issuance of the underlying policy, any renewal of the policy after the effective date of the statute is deemed to be subject to the intervening statute. *See e.g., Metropolitan Property & Liability Ins. Co. v. Gray,* 446 So.2d 216, 218 (Fla. 5th DCA 1984) ("It is generally held that the renewal of a contract of insurance constitutes the making of a new contract for the purpose of incorporating into the policy changes in the statute regulating insurance contracts ... [L]itigation rarely arises concerning whether statutes in ef-

fect on the renewal date are applicable to the policy. It is generally accepted that they are").

The evidence is uncontroverted that Defendant offered to renew the Agreement each year conditioned on (i) the property receiving a favorable inspection, and (ii) receipt of payment. The Court notes that Defendant did in fact renew these guarantees. Defendant's suggestion that § 482.227(2) is inapplicable is therefore without merit.

Alternatively, Defendant's purported contractual defenses that are articulated on the back of the Agreements fail on the evidence presented. Each disclaimer will now be discussed.

## Conducive conditions

▮ Defendant first points out that General Terms and Conditions, Paragraph 11 provides that if moisture or structural conditions conducive to subterranean termites are found to exist at the subject property after its initial treatment, then Defendant shall be relieved of any liability for damage repair. Paragraph 11 provides:

> If moisture and or structural conditions which are conducive to subterranean termites are subsequently found to exist, Defendant shall be relieved of any and all liability for damage repairs.

Defendant asserts that such conditions existed at Plaintiff's apartment complex and that Plaintiff was aware of those conditions. Defendant points out that in 1982, when the complex's current owners were in the process of purchasing the property, it conducted a thorough inspection of the property and a report was generated demonstrating termite infiltration and the existence of conditions which could lead to

excess water infiltration at the property. Defendant argues that because Plaintiff was made aware of the problems, but failed to remedy them, it cannot be held liable for any termite damage found.

As previously discussed, this Court received testimony that after said report was issued, the Defendant "cleared" the property (presumably after the above mentioned problems had been remedied by the seller) which allowed the sale to proceed. Mark Werner, the purchaser of Plaintiff, testified that he would not have closed the transaction without Defendant's clearance. There is no evidence to the contrary. Further, the Court finds that Defendant did not provide sufficient proof that moisture or structural conditions caused subterranean termites to enter the Plaintiff's buildings.

Additionally, Defendant knew of the property's condition when it inspected it annually from 1977 to 1999, when it prepared a wood destroying organism report in 1982, when stucco to ground contact became an area of concern in the industry during the 90s, and in 1997 following a special inspection associated with the potential remodeling. The cracked stucco, clogged gutters, wood or stucco to ground contact, improper drainage, soil accumulation, the presence of trees too close to the buildings, landscaping, missing wood trim and other items of deferred maintenance that Defendant points out should have been observable to Defendant's trained professionals when they were at the property.

Plaintiff points out that any uncured "conditions conducive" could have been brought to the owner's attention after the 1982 report was issued.[3] No evidence was

---

**3.** Defendant's billing letters plainly state that the inspector would discuss with the owner any problems he or she may have found on the property that contribute to termite infestation. Any defense based on laches or a statute of limitations must also fail.

presented that Defendant ever told the owner that it would not honor the guarantees due to any conditions which existed on the property until after the claim was made. Instead, Defendant continued to bill the property, conduct annual inspections, and collect premiums year after year as if the Agreement was still in place.

■ "A valid condition may be waived by a promisor, if, after its defective performance, he continues to recognize the existence of the contract, or if he retains its benefits for a reasonable time after he knows or should have known that the performance was defective." *Pan American Distributing Co. v. Sav-A-Stop, Inc.*, 124 So.2d 753, 755 (Fla. 1st DCA 1960). Estoppel is based on "the acceptance and retention of benefits by one having knowledge or notice of the facts of benefits from a contract ... which he might have rejected or contested ... [I]t precludes one who accepts the benefits from repudiating the accompanying or resulting obligation." *Doyle v. Tutan,* 110 So.2d 42, 47 (Fla. 3rd DCA 1959).

Defendant argues that it routinely alerted Plaintiff to the presence of termite activity in written treatment tickets dated in, among other years, 1983, 1987, and 1989. However, as previously discussed, the annual inspection reports showed no evidence of a *continuing* infestation. Accordingly, Paragraph 11 of the Terms and Conditions does not preclude the Defendant's liability.

**Pre-existing damage**

■ Defendant next argues that Paragraph 1 of the Terms and Conditions defeats Plaintiff's claims. That paragraph provides:

It is agreed that under this contract, Defendant is not responsible for the repair of visible damage existing as of the date of this contract except as such damage as described on the Graph and Spec-

ifications and for which a specific charge for the repair of same is made. It is possible that damage may, as of the date of this contract, exist in unexposed areas of the structure or in areas which are inaccessible to visual inspection. For this reason Defendant cannot guarantee that the damage disclosed by visual inspection of the premises (and which is indicated on the Graph and Specifications) represents the entirety of the damage which may exist as of the date of the initial treatment. It is specifically understood, therefore, that Defendant shall not be responsible for the repair of any damage which existed in areas or structural members which were not accessible for visible inspection as of the date of this contract.

As a threshold matter, there was apparently little visible damage present when the parties contracted, or else it would have been described on the "Graph and Specifications" referenced in the disclaimer.

The question thus arises as to whether the stucco siding prevented the discovery of any "pre-existing damage" when Defendant undertook responsibility for protecting the property. Defendant's entomologist, Dr. Joseph Maulden, agreed that there were no impediments to Defendant conducting an examination behind the exterior surfaces as had been done in 1982. The 1982 report covered areas both visible to the naked eye *and* behind the outer wall coverings. If termite infestation and pre-existing wood damage could be discovered behind the walls in 1982, then certainly it could have been discovered and reported to the owner in the inspections which occurred thereafter. Defendants' defense of concealed damage therefore lacks merit.

**Modifications to Building 4**

■ Defendant next contends that the structural modifications to Building 4 in

1996 voided the warranties pursuant to Paragraph 4 of the Terms and Conditions. This paragraph provides:

> This agreement covers the premises diagramed on the attached Graph and Specifications as of the date of actual treatment, and in the event the premises are structurally modified, altered, or otherwise changed after date of initial treatment, this agreement shall terminate unless a prior written agreement shall have been entered into between the owner and the company to reinspect the premises, provide additional treatment, and/or adjust the annual renewal fee.

Here, the evidence is that only one building, Building 4, was remodeled in 1996. Werner testified that there was no disturbance of the barrier in connection with the renovation, nor any structural modifications to the building. Further, the Plaintiff proffered testimony showing that Defendant was aware of the remodeling, visited the site, and thereafter continued its repair guarantees—including its contracts on Building 4. If there were a problem created by the remodeling, Defendant should have spoken. Any defense as found in this clause is thus waived.

### Structural defects and water leakage

■ Lastly, Defendant contends that structural and mechanical defects resulting in water intrusion into the units voids the contract. This defense is premised on Paragraph 2 of the Terms and Conditions, which provides:

> Structural and mechanical defects which result in water leakage in interior areas or through the roof, or exterior walls of the premises may destroy the effectiveness of treatment, thereby permitting infestation to continue after the date of initial treatment. If such a condition is discovered, it is agreed that the customer will be responsible for making such repairs as are necessary to correct the

structural or mechanical defect, and Defendant will upon completion of said repairs, provide additional treatment deemed necessary by the company to control the infestation in the area.

Plaintiff argues that this clause is not a defense but rather a declaratory statement. This Court agrees thus find that this paragraph does not preclude Defendant's liability in any way.

In sum, this Court finds that Florida Statutes Section 482.227 prevents Defendant from arguing that its defenses found on the back of the Agreements absolve it from liability. This Court further finds that even if Florida Statutes 482.227 does not apply to the contractual disclaimers at issue, Defendant cannot repudiate liability based on those defenses for the reasons articulated above.

On a more pragmatic level, this Court finds that Defendant's attempt to completely deny responsibility for any of the termite damage to Plaintiff's complex troubling. For 25 years, Defendant collected renewal premiums and fees for termite treatment. No evidence was produced that Defendant ever informed the Plaintiff that coverage under the repair bonds was in jeopardy. Defendant cannot now argue that coverage was terminated long ago or was never in effect.

### Exclusions found in Guarantees

### Live termite presence

■ The Guarantees at issue provide that Defendant is obligated to make repairs where, "at the time of discovery of the new damage, the damaged areas are infested with live subterranean termites." Dr. Nolan did not *observe* active termites in seven of Plaintiff's buildings (Buildings 3, 6, 12, 13, 14, 21 and the Clubhouse). Thus, Defendant argues that Plaintiff can-

not recover damages based on repairs to those buildings.

However, Dr. Nolan testified that he observed recent termite damage to the buildings in question and that other evidence of active termites existed even if he did not actually observe any active termites. There is no contradictory evidence in the record. Thus, this Court accepts Plaintiff's expert's opinion that he observed evidence of active termites at the time the damage was discovered in the buildings at issue.

**Preexisting damage**

A prerequisite to recovery under the Guarantees is that Plaintiff must establish that the termite infestation occurred *after* the issuance of the Guarantees. At the inception of the relationship, Defendant prepared a graph showing existing termite infestation in the corner of one building. Plaintiff argues that the only logical conclusion which can be drawn from this evidence is that the subsequent termite destruction in that building, and in the remaining buildings, occurred after 1977. Dr. Nolan, who inspected the termite damaged wood at the property, testified that no more than 5% of the termite damage on the property occurred prior to 1977.

However, Defendant's expert testified that 10% to 20% of the termite damage occurred prior to 1977. The two experts used different theories to explain their respective opinions. Between the two, Dr. Nolan's testimony is the more credible given his extensive familiarity with the Plaintiff's infestation and the extended time he spent at the site.

Therefore, the Court finds that Defendant was contractually obligated to repair 95% of the allowed expenses attributable

to termite damage at the Plaintiff's apartment complex.[4]

**$100,000 limitation**

■ Defendant argues that the Guarantees specifically and expressly limit Defendant's liability for damage repairs to an amount which "shall in no event exceed $100,000 aggregate loss." Defendant argues that the parties executed a single Agreement and thus there is a single $100,000 aggregate damage cap, and that cap limits Plaintiff's allowable damages to $100,000.

Plaintiff, however, correctly points out that at the inception of the parties' relationship, Defendant issued 23 Agreements and Guarantees and that each of the was separately numbered, identified by building, and invoiced every year through the year 2000.

The Court further notes that Wayne Gorecki, Defendant's corporate representative, repeatedly referred to the Guarantees as "contracts." Also, as late as 1999, Defendant confirmed in writing that the *contracts* were still in effect. Based on this evidence as well as the fact that there were 23 separate Agreements and Guarantees issued and renewed annually, this Court finds that the $100,000 damage cap applies to each of Plaintiff's buildings.

This Court notes that Plaintiff asserts that no damage cap applies to any of the buildings. Plaintiff argues that damages for breach of Defendant's inspection obligations, initial treatment obligation, and its subsequent retreatment obligations are not limited by any contractual restriction. A review of the Agreements and Guarantees does not support this assertion.

---

4. Evidently, Plaintiff has reduced its requested damage figures by 5%. Thus, those figures will serve as the basis for this Court's damage calculation.

## DAMAGES

■ In Florida, contract law provides that an award of damages in a breach of contract action is intended to place the injured party in the position he or she would have been in had the breach not occurred. *Sharick v. Southeastern University of Health Sciences, Inc.,* 780 So.2d 136, 139 (Fla. 3rd DCA 2000).

■ In real property cases, the measure of damages flowing from a breach of contract are the greater of the diminution in value of the real property or the repair costs, or a combination of both. *Bisque Assoc. of Fla., Inc. v. Towers of Quayside No. 2 Condo. Assoc., Inc.,* 639 So.2d 997, 999 (Fla. 3rd DCA 1994).

The Plaintiff claims the following expenses are attributable to the repair and replacement of damage caused by subterranean termites:

| Damage | Repair Costs |
|---|---|
| Exterior Paint | $ 24,963.32 |
| Replacement of Storage Room Doors | 41,744.56 |
| Removal of Stucco and Wood | 864,269.61 |
| Replacement of Original Stucco | 1,249,499.83 |
| Replacement of Windows & Doors | 48,340.00 |
| Sealant on Rear Balcony Decks | 23,416.00 |
| Installation of Gutters and Downspouts | 27,131.25 |
| Re-installation of Electrical Items | 22,500.00 |
| Removal and Replacement of Landscaping | 118,830.00 |
| Reparation of Lawn Irrigation System | 18,600.00 |
| Reparation/Replacement of Drywall | 77,644.00 |
| Reparation/Alteration of Turret Section | 7,500.00 |
| Replacement of Rear Patio Roof Section | 37,360.32 |
| Replacement of Front Entrance Canopy(s) | 16,307.00 |
| TOTAL | $2,578,105.89 |

(P17)

■ As a threshold matter, damages are awarded when the Plaintiff is able to prove them with reasonable certainty. *Hutchison v. Bilodeau,* 553 So.2d 304, 306 (Fla. 1st DCA 1989)("[I]t is sufficient that there be a reasonable basis for computing damages even if the results may be only approximate"). The Court does not accept that all of the categories of Plaintiff's claimed damages are recoverable.

### Interest and investigation costs

■ Plaintiff attempts to recover interest on repair loans and consulting fees. Plaintiff also argues that it is entitled to additional damages because of a reduced occupancy rate during the time of repairs; Plaintiff alleges that the vacancy rate at the apartment complex increased considerably as a result of the repair project.

The Defendant correctly notes, however, that its Guarantee limits the kind of damages that Plaintiff may recover to "structural and contents damage," and damages for lost rents, interest, investigation and other costs may not be recovered. Thus, the consulting fees are not recoverable, nor are lost rents. Even if this were not the case, the lost rent would not be recoverable.

■ In order to recover lost profits, a claimant must show damages with reasonable certainty, and that the damages flowed as a natural and proximate result of the wrongful conduct alleged. *Royal Typewriter Co. v. Xerographic Supplies Corp.,* 719 F.2d 1092, 1105 (11th Cir.1983).

■ Plaintiff did not introduce sufficient evidence that reduced occupancy rates were the result of termite damage repair. Additionally, Plaintiff's evidence does not establish the kind of "stability and regularity" with regard to occupancy rates that Florida courts require as a basis for an award of lost profits. *Belcher v. Import Cars, Ltd., Inc.,* 246 So.2d 584, 587 (Fla. 3rd DCA 1971). Plaintiff's Disclosures to this Court report occupancy rates in the several years preceding the renovation that fluctuated by more than ten percent. Those rates are not sufficiently stable "as to give its past record of profits some probative value as indicating the

probable subsequent profits." *Id.* Thus, Plaintiff is not entitled to recover lost rents. Plaintiff also seeks an additional $55,000 that it argues is necessary to retreat the property for termites (102). Because Defendant has a contractual obligation to retreat the property, this amount is recoverable by Plaintiff.

## Specific items of structural damage

### Clubhouse

■ Dr. Nolan found only fungi damage at the Clubhouse and did not testify that there was termite damage there. Plaintiff argues that this charge is nevertheless recoverable because the Clubhouse was the last building repaired and given the extensive termite damage found in all prior buildings investigated, it was prudent to remove the stucco from this building as well. This Court disagrees and holds that expenses related to the Clubhouse are not recoverable.

### Stucco removal

■ Defendant contends that all the stucco in the other buildings did not need to be completely removed to determine the extent of the termite and wood related damage. Its construction consultant, Diane Mucha, testified that a band should have been cut around the base of the buildings to determine where termites had breached the barrier, and that the stucco should have been removed only as a last resort.

Plaintiff counters that: (1) inspection bands and windows had in fact been cut around the bottoms of all buildings except Building 1 prior to removing the stucco, just as she advocated, and; (2) that the

decision to remove the stucco on all buildings was made only after termite damage was found in all buildings inspected, and after determining that it was more cost effective to remove the stucco than to attempt piecemeal patching.

Because Plaintiff's expert was present for a much longer time during the repairs and renovations, and made a great deal of first hand observations, this Court gives his testimony greater weight. With the exception of the Clubhouse, his Court finds that the stucco removal charge is recoverable.

### Stucco replacement

Plaintiff seeks $1,249,499.23 for the replacement of the stucco siding on the Plaintiff's buildings. This expense was not borne by the Plaintiff, however, because stucco was never installed.[5] Instead, Plaintiff sided the buildings in vinyl, which cost $591,000.[6]

Defendant contends that Plaintiff is not entitled to the stucco replacement cost not only because the stucco was not installed, but also because the renovation plan developed prior to the discovery of the termite damage contemplated a vinyl exterior.

Although there is testimony that Plaintiff could not afford to install new stucco, there is also testimony that Terrell Rhye, Plaintiff's new primary investor, regularly added vinyl siding when he renovated apartments. Defendant further provides evidence that Plaintiff *wanted* the building to have a new look. On the stand, Rhye stated, "[I] typically come into a project and put vinyl siding on the buildings to give a project and immediate and dramatic upgrade in its cosmetic appearance."

---

5. The renovation work at the Plaintiff Apartments is completed.

6. The cost of the vinyl siding was $591,000 according to Bowyer, or $480,000 according

to Bowen. The Court will use. Bowyer's figure because he is the designated construction consultant.

There was additional testimony that by 1999, the Plaintiff considered the apartments' "look"—its original condition—to be dated.

Plaintiff, however, argues that the higher stucco replacement cost is recoverable. Plaintiff notes that under the restoration rule, damages for wrongful injury to property are generally measured by the value of the costs of repairing or restoring the property to its *original condition.* However, this Court cannot ignore the potential for a windfall in this case and further notes that the case law Plaintiff cites is not on point.

The instant case presents a unique issue because a less expensive fix is not necessarily a less valuable fix. Plaintiff chose a $591,000 vinyl repair instead of the $1,249,499.93 stucco replacement, but failed to introduce competent evidence that the less expensive repair reduced the value of the building. Moreover, the evidence does not support the proposition that the stucco was even *subjectively* more valuable to Plaintiff. Thus, the difference between the vinyl replacement and the estimated cost to side the buildings with stucco is not recoverable.

### Painting and replacement of Tudor trim

Plaintiff also argues that recoverable damages include the cost to replace the Tudor look wood banding and trim on the exterior of the Plaintiff buildings. Like the installation of the stucco itself, this trim was not replaced and is not planned to be replaced. As discussed, the Defendant proffered evidence that the new owners considered the Tudor look dated.

Again, to award more than the actual cost of repairs to Plaintiff would be to give it a substantial windfall and this Court refuses to do so.

### Wood replacement

Defendant next argues that the wood replacement costs set forth in Boyer's report were excessive or exaggerated.

Defendant's construction consultant, Diane Mucha, stated that some wood replacement costs could have been avoided by adding new wood to deteriorated wood rather than replacing the entire wood plank. Plaintiff's expert, Bowyer, testified that, in most cases, when the siding was removed, Plaintiff discovered that the structural two-by-fours were completely deteriorated and had to be replaced. Because Bowyer was present during renovations, and Mucha was not, this Court finds Bowyer's testimony more credible on this issue.

Mucha also said that replacement of wood around the storage rooms and window and door frames might not have been necessary. Plaintiff's expert argues that window frames and door jams had to be replaced because the removal of wood by termites has caused the doors and window frames to deteriorate. Again, because Plaintiff's expert was present during the restoration project, but Defendant's was not, this Court finds Bowyer's testimony to be the more compelling of the two and will not second guess Plaintiff's allocation of these damages to Defendant.

### High wood replacement cost

Mucha testified that, using R.S. Means testing, Plaintiff's wood replacement costs were overstated. However, because this Court is determining *actual* damages after-the-fact, it finds Mucha's cost *estimates* less probative than the expenditures Plaintiff paid for the repairs.

### Moisture damage to wood

■ Defendant also argues that the wood replacement damages should be reduced to compensate for wood rot due to excessive moisture. Defendant's argu-

ment is premised on the testimony of Dr. Maulden, who based his opinion primarily on his observation of photographs showing black staining on some of the wood planks photographed at the site.

Plaintiff contends that Dr. Maulden erroneously discounted the replacement costs everywhere wood rot was present— even if the timber showed both wood rot due to fungus and termites and contends that as long as termite damage was present which jeopardized structural integrity, the timber should have been replaced and taxed as an item of damage. Additionally, Dr. Nolan testified that one can not make an accurate finding of moisture damage in wood based on the observation of photographs because in this case the felt backing behind the stucco had adhered to or stained many of the wood timbers. Plaintiff points out that Dr. Maulden stated that it is possible that moisture carried or introduced by termites themselves could have been sufficient enough to establish fungi on otherwise sound and dry wood.

This Court finds that Plaintiff provides sufficient evidence to support an award of wood replacement costs where the wood showed termite damage as well as wood rot due to excessive moisture.

**Wood that did not appear in summary reports**

Defendant also argues that Plaintiff overstated its wood damage figures by including wood which was not depicted on Dr. Nolan's summary reports. However, Bowyer testified that his damage reports included the replacement of damaged wood depicted on the more detailed field notes— rather than only the summaries—prepared by Dr. Nolan. This Court finds those wood replacement charges recoverable.

**Doors, stairs, decks, etc.**

Defendant also objects to charges for the painting of doors, stairs, etc; replace-

ment of storage room doors; replacement of certain glass doors and windows; and the sealing of rear balcony decks because, *inter alia,* termite damage to these items were not reported in Dr. Nolan's summaries. Upon review of the testimony by Plaintiff's experts, the Court is satisfied that Plaintiff satisfactorily explains how these charges are linked to the termite damage and allows those expenses.

**Installation of gutters and downspouts**

■■■ Bowyer's Report includes charges to replace guttering on many of the Plaintiff's buildings. There is no dispute that termite damage did not impact the facia areas of the buildings where the gutters hung. Plaintiff claims that Defendant is liable for gutter replacement because the gutters would have to be replaced if the stucco were replaced. However, Defendant proffered ample evidence regarding the poor and, in some instances, inoperable condition of the gutters. This charge is not recoverable.

**Irrigation system**

Like the gutters, there is also no evidence that the irrigation system was damaged by termites; workers or work activity during renovation damaged the irrigation system. In his deposition, Richard Haines, the relevant subcontractor, testified that when his crew broke components of the irrigation system they generally made the repairs to the system themselves. This cost is not recoverable.

**Miscellaneous construction expenses**

■■■ Defendant argues that it should not be responsible for the light fixture replacements, landscaping, interior drywall, door repairs, and window repairs reflected in Bowyer's amended cost summary report. The Court finds, based on the testimony of Bowyer, that the replacement of these items was necessitated by the scope of the repair project and the natural-

ly occurring damage associated with any project of this magnitude. Thus, these expenses are recoverable.

■ Finally, Defendant has made a general attack on Plaintiff's claim by suggesting that the claim is nothing more than an attempt to have Defendant pay for the renovation of the apartment complex. However, Defendant's responsibilities are not diminished because the termite infesta-tion was discovered in the course of planned renovations. The Court again notes that Defendant had the option to be present during the repair project and to participate in the repair decision making process.

### Conclusion

The Court will enter a separate final judgment awarding Plaintiff damages of $1,863,600.10.[7]

## ATTACHMENT

| Building Number | Revised Claim Amount | Add Vinyl Siding Installation | Subtract Stucco Replacement | Subtract Irrigation Repairs | Subtract Gutter Replacement | Total Recoverable Claim |
|---|---|---|---|---|---|---|
| 1 | 118,026.31 | 25,695.65 | 66,340.06 | 1,200 | 1,325 | 74,856.90 |
| 2 | 112,393.06 | 25,695.65 | 47,945.01 | 1,400 | 1,325 | 87,419.70 |
| 3 | 123,987.18 | 25,695.65 | 66,340.06 | 1,400 | 1,524 | 80,419.77 |
| 4 | 110,218.98 | 25,695.65 | 66,340.06 | 1,200 | 1,524 | 66,850.57 |
| 5 | 125,685.95 | 25,695.65 | 66,340.06 | 1,000 | 925 | 83,116.54 |
| 6 | 107,446.27 | 25,695.65 | 55,957.86 | 1,000 | N/A | 76,184.06 |
| 7 | 148,979.46 | 25,695.65 | 75,720.3 | N/A | N/A | 98,954.81 |
| 8 | 159,374.67 | 25,695.65 | 75,720.3 | N/A | N/A | 100,000 [1] |
| 9 | 98,195.25 | 25,695.65 | 41,636.60 | 1,200 | 2,333.5 | 78,720.8 |
| 10 | 80,768.48 | 25,695.65 | 36,578.83 | N/A | 1,100 | 68,785.3 |
| 11 | 105,975.31 | 25,695.65 | 54,557.86 | 1,000 | 925 | 75,188.1 |
| 12 | 98,245.93 | 25,695.65 | 41,636.60 | 1,200 | 2,333.5 | 78,771.48 |
| 13 | 95,521.05 | 25,695.65 | 41,636.60 | 1,200 | 2,333.5 | 76,046.6 |
| 14 | 96,691.13 | 25,695.65 | 41,636.60 | 1,150 | 2,333.5 | 77,266.68 |
| 15 | 138,965.85 | 25,695.65 | 47,945.01 | N/A | 1,720 | 100,000 [2] |
| 16 | 133,885.49 | 25,695.65 | 47,945.01 | N/A | N/A | 100,000 [3] |
| 17 | 108,754.29 | 25,695.65 | 54,517.85 | N/A | 1100 | 78,832.09 |
| 18 | 111,659.48 | 25,695.65 | 54,517.85 | N/A | N/A | 82,837.28 |
| 19 | 104,648.45 | 25,695.65 | 54,517.85 | 1,200 | 925 | 73,701.25 |
| 20 | 102,968.80 | 25,695.65 | 54,517.85 | 1,000 | 925 | 72,181.60 |
| 21 | 109,309.97 | 25,695.65 | 47,945.01 | 1,200 | 1,719.25 | 84,141.36 |
| 22 | 159,605.10 | 25,695.65 | 87,393.1 | 1,500 | 2,080 | 94,327.65 |

7. Attached is a breakdown of allowable charges.

1. There were $109,350.02 in covered repairs but the $100,000 damage cap applies.

2. There were $114.996.49 in covered repairs but the $100,000 damage cap applies.

3. There were $111,636.13 in covered repairs but the $100,000 damage cap applies.

Total All Buildings $1,808,600.10

Plus Cost of Retreatment $55,000

Grand Total $1,863,600.10

### *JUDGMENT*

This proceeding is before the Court upon the Complaint of Westminster Associates, Ltd., seeking damages against Orkin Exterminating Co., Inc. Upon findings and fact and conclusions of law separately entered, it is ORDERED:

Judgment is entered in favor of plaintiff, Westminster Associates, Ltd., and against defendant, Orkin Exterminating Co., Inc., for **$1,863,600.10** for all of which let execution issue.