Charlotte **HOROWITZ**, Appellant,

v.

**BOARD OF CURATORS OF the UNIVERSITY OF MISSOURI et al., Appellees.**

No. 75–1949.

United States Court of Appeals, Eighth Circuit.

Submitted June 15, 1976.

Decided July 16, 1976.

Rehearing and Rehearing En Banc Denied Sept. 27, 1976.
See 542 F.2d 1335.

Arthur A. Benson, II, Kansas City, Mo., for appellant.

Marvin E. Wright, Columbia, Mo., for appellee, Jackson A. Wright, James S. Newberry and Richard S. Paden, Columbia, Mo., and Fred Wilkins, Kansas City, Mo., on brief.

Before HEANEY, ROSS and STEPHENSON, Circuit Judges.

ROSS, Circuit Judge.

Charlotte Horowitz has brought this action under 42 U.S.C. § 1983 challenging her dismissal from the University of Missouri-Kansas City (UMKC) School of Medicine in July 1973. The defendants are the governing body of the institution and certain officials of the medical school. The case was tried without a jury and judgment was for the defendants, from which Horowitz now appeals. We reverse the district court judgment.

The facts are not seriously in dispute. The UMKC Medical School admitted its first students in August 1971; Horowitz was admitted at that time as an advanced standing student. She has a Bachelor's degree in chemistry from Barnard College and a Master's in psychology from Columbia University. She studied pharmacology at Duke for one year, taking the same curriculum as the first year medical students there. She began as a sophomore at the Women's Medical College of Pennsylvania but withdrew in good standing because of illness her first semester. She also did graduate study and worked in the field of psychopharmacology at the National Institute of Health in Bethesda, Maryland for five years. She scored above the 99th percentile on the Graduate Record Examination in Verbal Aptitude, Quantitative Aptitude, Advanced Psychology and Advanced Chemistry. Her scores on the Medical College Admissions Test were also extremely high, with scores in the 99th percentile in the General Information and Science categories. She received excellent recommendations from those with whom she had worked at the National Institute of Health and educators.

The UMKC Medical School's curriculum is intended to educate its students to become competent practicing physicians. Therefore, the school considers that a student must become proficient in clinical skills in order to earn an M.D. degree. Both Horowitz and the University knew at the time of her entrance, however, that she intended to become a psychiatrist and teach or do research.

The policies and regulations of the school do not state the requirements of graduation in terms of a certain number of courses which must be completed. During the last two years of medical education at UMKC a student is required to pursue studies in rotational units which deal with various areas of medicine: e. g. Pathology-Anatomy, Psychiatry, Obstetrics-Gynecology. These units generally included clinical responsibilities as well as academic study. Horowitz received credit for all these rotations except Emergency Room, her last rotation, which was not completed until after it was determined she would not graduate.[1] Her academic (as opposed to practical) performance certainly gave no cause for complaint. She scored first in the school on Part I of the National Board Examination for medical students and second on Part II. She ranked fourth in her class in quarterly exams given in February 1973, and second in the May 1973 exams. In the latter examination she was either first or second in 14 of the 30 categories.

Although she received credit in all rotational units except Emergency Room and her docent, the faculty member who had the closest contact with her, regarded her performance as outstanding throughout her

---

1. The University draws a distinction between receiving credit and satisfactorily completing a course, and contends that Horowitz did not satisfactorily complete courses besides Emergency Room. It does not appear that this distinction was communicated to Horowitz or the other students, however.

first year,[2] other faculty members felt her clinical performance was deficient. This first came to light in the spring of 1972 when faculty members in the Pediatrics course criticized her lack of patient rapport and "expertise in coming to the fundamentals of the clinical problem," erratic attendance, and poor personal hygiene. These criticisms were brought to Horowitz's attention by her docent, although she was not shown her formal course evaluations.

Toward the end of her first year at the school, Horowitz's record was reviewed by the Council on Evaluation, a body of students and faculty, which recommended to the Dean that she not be advanced to Year VI, the final year of the medical school. However, in a letter dated July 5, 1972, which confirmed an earlier conversation, the Dean told Horowitz that she was being advanced to Year VI, but was on probation. The letter pointed out her deficiencies as follows:

> Your acquisition of information is good. Your relationship with others has not been good and represents a major deficiency. You need to improve your relationship with others rapidly and substantially. This involves keeping to established schedules; meeting all clinical responsibilities on time and gracefully; attending carefully to personal appearance, including hand washing and grooming; participating appropriately in the activities of the School; and directing criticisms and suggestions maturely to your Docent and to the faculty member who is in charge of a curriculum block as you may have criticisms and suggestions.

The letter also stated that noncompliance with certain standards of conduct "is incompatible with continued progress and graduation." After she was placed on probation, Horowitz was counseled frequently by her docent, the Dean and other faculty members until her ultimate dismissal.

In November of 1972 the University's Provost for the Health Sciences promulgated changes in the procedures for deciding questions of students' academic standing. The Council on Evaluation thereafter made recommendations to the Coordinating Committee, which consisted of faculty members. The Coordinating Committee had veto power over the Council's recommendations, and the Dean had veto power over recommendations of the Coordinating Committee. Provision was made for students' personal appearances before the Council upon its request if that body felt it had inadequate information. It was also provided that a student could be given additional practical and oral examinations if the Council needed to resolve questions of competence as a physician. On December 26, 1972, the Council on Evaluation reconsidered Horowitz's status and recommended that she not be allowed to graduate on schedule in June 1973. This recommendation was accepted by the Coordinating Committee. The Dean approved this recommendation and on February 7, 1973, he wrote a letter to Horowitz reviewing a conference with her, held January 26. The Dean's letter stated that she had not made sufficient progress as outlined in the July 5 letter and was being continued on probation. She was informed that she would not be able to graduate as scheduled and that she would have to improve markedly in the areas of clinical competence, peer and patient relations, personal hygiene and ability to accept criticism. If she did not make the improvement considered necessary by the Council on Evaluation, she would not be able to continue at the medical school after May. She was told that she could request a set of oral and practical examinations as an "appeal" of the decision not to graduate her in the spring of 1973. Horowitz initiated such a request.

Since no such proceeding had ever been requested and no procedures had been set

---

2.  The docent's role was compared by UMKC to that of an ombudsman. During a student's academic career he or she would have more frequent and closer contact with the docent than any other faculty member. Horowitz's

docent testified that he would have recommended that she be allowed to graduate in the spring of 1973, and be given a residency, and in fact he had so recommended in June 1972.

up, the school had to create a procedure to be followed in Horowitz's case. It was arranged that she would be examined by seven experienced physicians on the faculty, none of whom had appreciable previous contact with Horowitz. They would evaluate her clinical abilities in the areas of pediatrics, pathology and anatomy, general medicine, and obstetrics and gynecology. The Dean informed the seven physicians by letter and a meeting that they were to make one of three recommendations: a) graduation on schedule; b) continued probation and reassessment of her status in May 1973; c) dismissal from the medical school. The option of recommending additional study after May 1973 without dismissal was not given to them. A majority opinion of the seven doctors was to be determined and submitted to the Council on Evaluation. The examinations were conducted and the doctors submitted their reports. Two recommended that Horowitz graduate on schedule, two recommended that she continue on probation, and two recommended that she be dropped from school. One believed she was not qualified to graduate at that time, but expressed no further opinion. Although there was no clear majority opinion the panel was not called together as the procedures contemplated. Their written individual recommendations were submitted to the Council on Evaluation.

On May 1, 1973, after considering the panel's reports, the Council reaffirmed its opinion that Horowitz should not be allowed to graduate in June, and the Coordinating Committee accepted this recommendation. The Dean also approved, and on May 7 this decision was communicated to Ms. Horowitz. At that time she was told that a decision would be made soon on whether she would be allowed to remain in

school. Horowitz wrote a letter to the Dean requesting that she be allowed to remain in school for a short time to correct her deficiencies, but this letter was not answered.

On May 28, 1973, the Council on Evaluation met again to reconsider Horowitz's status in light of her performance in courses taken that spring, and it was decided that she should be dropped from the school. On June 4 the Coordinating Committee accepted this recommendation and Horowitz was notified by the Dean that she was no longer in school on July 3. Horowitz sought reversal of this decision from the Provost for the Health Sciences, who denied her request.

Horowitz was never given a chance to appear before the Council on Evaluation, the Coordinating Committee or the Dean, for a hearing during the dismissal procedure, nor was she informed of the time or place of any of their meetings. Neither was she given copies of the formal evaluations or other evidence which the Council and the Committee considered.

The evidence reveals that Horowitz rejected suggestions by the medical school faculty that she alter her professional plans and seek a Ph.D. rather than a medical degree because a Ph.D. would not allow her to conduct the experimentation in psychopharmacology that was her goal. It was stipulated that she was offered employment at the University of North Carolina, conditional upon her obtaining the degree of Doctor of Medicine, and she testified that she had accepted that offer in November 1972. It was also uncontroverted that Horowitz's dismissal from medical school will make it difficult or impossible for her to obtain employment in a medically related field or to enter another medical school.[3]

---

**3.** Dr. Cohen, who had 30 years of experience in hiring M.D.'s, Ph.D.'s and others for medical research in various institutions testified:

Yes, I would be very much concerned about an individual who was dismissed from a medical school, or, for that matter, from any graduate school. This to me is a very serious matter and I would have to look very carefully into that person's background, record and so forth. And if there were two individuals

that, say, that person or someone else were applying and otherwise would have equal qualifications, roughly, I would lean heavily to the other person who was not dismissed from a graduate school.

\* \* \* \* \* \*

Yes, I think it would be a significant black mark against that person's name, I think it would stigmatize that individual, I that that person would probably be—well, would have

The district court, in holding for defendants, relied on "the immunity accorded [educational authorities] in academic matters . . . .", absent a showing of bad faith or arbitrary and capricious action. We are cognizant that some decisions recognize a distinction between expulsions for misconduct and academic failure. *See, e. g., Brookins v. Bonnell*, 362 F.Supp. 379, 382 (E.D. Pa.1973). We express no opinion on the validity of that distinction under other circumstances. However, our decision in *Greenhill v. Bailey*, 519 F.2d 5, 8–9 (8th Cir. 1975) acknowledges "that the dictates of due process, long recognized as applicable to disciplinary expulsions . . . may apply in other cases as well, where the particular circumstances meet the criteria articulated by the Supreme Court in *Board of Regents v. Roth*, [408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)], and *Perry v. Sindermann*, [408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)]." In *Board of Regents v. Roth, supra*, 408 U.S. at 573, 92 S.Ct. 2707, the Court recognized that action of the state which "imposed . . . a stigma or other disability that foreclosed . . . freedom to take advantage of other employment opportunities" was a deprivation of liberty which could not be accomplished without notice and a hearing. In *Greenhill, supra*, 519 F.2d at 8, we found such stigmatization where a medical student's expulsion for academic failure on the basis of lack of intellectual ability or inadequate prepara-

tion effectively foreclosed him from pursuing a medical education, because of the inherent suggestion that he was unfit to study medicine.

The unrefuted evidence here establishes that Horowitz has been stigmatized by her dismissal in such a way that she will be unable to continue her medical education, and her chances of returning to employment in a medically related field are severely damaged. The dismissal was effected without the hearing required by the fourteenth amendment.[4]

We reverse and remand to the district court with instructions to order defendants to provide Horowitz with a hearing before the decision making body or bodies, at which she shall have an opportunity to rebut the evidence being relied upon for her dismissal and accorded all other procedural due process rights.[5]

---

great difficulty to get into another medical school, if at all.

Transcript at 25–26. We note that UMKC's own application forms require that a student fully explain the reasons they were required to leave "any college, graduate or professional school . . . because of deficiencies in either conduct or scholarship." Plaintiff's Exhibit 10. We believe the evidence in this case makes it factually distinguishable from those in which a damaging stigma was not proved or was inadequately alleged. *E. g. Bishop v. Wood,* —— U.S. ——, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 573–574, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

4. The parties agree that the appeal procedure, involving tests administered by the panel of seven doctors, related only to the decision not to graduate Horowitz, and not to the decision to expel her. Nevertheless, we doubt that this procedure would satisfy the requirement of due process, *since the panel itself was only an examining board without any power except the power to make recommendations to another body which also had only that same power.*

5. Because of our disposition of this case we do not reach the substantive due process ground advanced by Horowitz.