780 So.2d 136 (2000)
Keith M. SHARICK, Appellant,
v.
SOUTHEASTERN UNIVERSITY OF THE HEALTH SCIENCES, INC., d/b/a College Of Osteopathic Medicine, Appellee.
No. 3D98-2674.
District Court of Appeal of Florida, Third District.
August 2, 2000.
*137 Richard A. Barnett, Hollywood, for appellant.
Panza, Maurer, Maynard & Neel, Tallahassee, and Heidi F. Friedman, Ft. Lauderdale, for appellee.
Before SCHWARTZ, C.J., and SHEVIN and SORONDO, JJ.
SORONDO, J.
Keith M. Sharick, a fourth-year medical student, was dismissed from the College of Osteopathic Medicine (Southeastern), when he was given a failing grade in the final course he required for graduation, a rural rotation in general medicine at the *138 Clewiston Community Health Center. Following several unsuccessful appeals within the university's review process, Sharick filed a complaint, which was amended several times, alleging multiple tort and contract claims against Southeastern. The only claim that ultimately went before the jury was breach of implied-infact contract. The trial court disallowed Sharick's claims for specific performance and past and future lost earning capacity and only permitted the jury to consider damages with respect to tuition expenses. The jury found for Sharick, concluding that Southeastern's decision to dismiss him was arbitrary, capricious, and/or lacking any discernable rational basis, and awarded a partial reimbursement of the tuition paid to Southeastern. Sharick now appeals, claiming that the trial court erred in denying him the right to plead and prove loss of future earning capacity. We reverse.
"The relation between a student and an institution of learning privately conducted, and which receives no aid from the public treasury, is solely contractual in character." John B. Stetson Univ. v. Hunt, 88 Fla. 510, 517, 102 So. 637, 640 (1924). "It is generally accepted that the terms and conditions for graduation are those offered by the publications of the college at the time of enrollment. As such, they have some of the characteristics of a contract between the parties, and are sometimes subject to civil remedies in courts of law." University of Miami v. Militana, 184 So.2d 701, 704 (Fla. 3d DCA 1966).
We begin our analysis by acknowledging that state and federal courts have historically distinguished between the judicial fact finding process and academic judgment regarding the performance of students, particularly when considering whether a student is qualified to be a physician. See generally Board of Curators, Univ. of Mo. v. Horowitz, 435 U.S. 78, 88-92, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978)(determination of whether to dismiss student for academic reasons based upon judgment that student did not have the necessary clinical ability to perform adequately as medical doctor requires expert evaluation and is not readily adapted to procedural tools of judicial or administrative decision making); Militana v. University of Miami, 236 So.2d 162, 164 (Fla. 3d DCA 1970)(quoting Connelly v. University of Vt. & State Agric. College, 244 F.Supp. 156, 160-61 (D.C.D.Vt.1965))("A medical school must be the judge of the qualifications of its students to be granted a degree; Courts are not supposed to be learned in medicine and are not qualified to pass opinion as to the attainments of a student in medicine.").
Accordingly, judicial review of a private educational institution's determination of academic performance in this context is limited to whether the challenged determination was arbitrary and capricious, irrational, made in bad faith, or in violation of constitution or statute. See Hunt, 88 Fla. at 518-19, 102 So. at 640-641 ("a mere mistake of judgment on the part of a school officer in governing his school, either as to his duties or as to facts submitted to him, does not make him liable, but it must be shown that he acted in the matter complained of wantonly, willfully or maliciously."); Montalvo v. University of Miami, 705 So.2d 1042, 1043 (Fla. 3d DCA 1998); Militana, 236 So.2d at 164.
In this case, the jury found that the university's decision to dismiss Sharick was arbitrary, capricious, and/or lacking any discernable rational basis. This determination is supported by competent, substantial evidence. Southeastern has not challenged the propriety of the adverse jury verdict on cross-appeal. Therefore, the sole issue presently before the court is the appropriate measure of damages for Sharick's wrongful dismissal less than two months prior to when he expected to graduate *139 and obtain his degree as a doctor of osteopathic medicine (DO).[1]
The purpose of compensation for a breach of contract is to place the injured party in the position he or she would have been in had the breach not occurred. See generally 17 Fla.Jur.2d Damages § 18 (1997). Damages recoverable by a party injured by a breach of contract are those which would naturally result from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was made. See Douglass Fertilizers & Chem., Inc. v. McClung Landscaping, Inc., 459 So.2d 335, 336 (Fla. 5th DCA 1984). The relationship between the parties in this case was essentially a contract between the party who paid a fee for services, the student, and the provider of those services, the private university. Southeastern contends that Sharick contracted with it solely to provide an education in exchange for payment of tuition. We disagree.
"The service rendered is the provision of an educational experience designed to lead to a college degree." Gross v. Family Servs. Agency, Inc., 716 So.2d 337, 339 (Fla. 4th DCA 1998) (emphasis added), approved sub nom. Nova Southeastern Univ. v. Gross, 758 So.2d 86 (Fla.2000). "When a student is duly admitted by a private university ... there is an implied contract between the student and the university that, if [the student] complies with the terms prescribed by the university, [the student] will obtain [a] degree." Harwood v. Johns Hopkins Univ., 130 Md.App. 476, 747 A.2d 205, 209 (2000); see also Alden v. Georgetown Univ., 734 A.2d 1103, 1111 n. 11 (D.C.1999); Bilut v. Northwestern Univ., 269 Ill.App.3d 125, 206 Ill.Dec. 531, 645 N.E.2d 536, 542 (1994)("The foundation of [the relationships between educational institutions, their students, and faculty] is the understanding that the students will abide by and adhere to the disciplinary regulations and the academic standards established by the faculty and the university; and that upon the satisfactory completion of their studies, they will be awarded a degree in their chosen discipline."); Carr v. St. John's Univ., N.Y., 17 A.D.2d 632, 231 N.Y.S.2d 410 (1962)("The university cannot take the student's money, allow him to remain and waste his time in whole or in part (because the student might regard it as a waste of time if he does not obtain the degree), and then arbitrarily expel him or arbitrarily refuse, when he has completed the required courses, to confer on him that which it promised, namely, the degree"), aff'd, 12 N.Y.2d 802, 235 N.Y.S.2d 834, 187 N.E.2d 18 (1962).
Southeastern's publications at the time of Sharick's enrollment clearly support this conclusion. The preface to the student handbook reflects that the "objective of the University is to offer ... health care science training and education to its students with the purpose of developing competent physicians ... who can serve in all areas of our region." The handbook proceeds to identify Southeastern endorsed organizations whose goal is to produce osteopathic physicians. The course of study is outlined as a "four year curriculum leading to the DO degree." (emphasis added). As such, the receipt of a DO degree upon the successful completion of Sharick's studies was reasonably within the contemplation of the parties at the time Sharick and Southeastern entered into their implied-in-fact contract.
In valuing the loss of this degree within the context of an arbitrary, capricious or bad faith deprivation of such, we *140 conclude that it is appropriate to consider the possibility of lost future earnings. We agree with Sharick that the value of a professional degree, particularly to a prospective physician who has successfully completed the overwhelming majority of the academic and clinical requirements, significantly exceeds the tuition cost expended. Southeastern argues that recovery of anything beyond tuition reimbursement when a school dismisses a student from classes is precluded because any other damages would be too remote, contingent, conjectural and speculative and could not be established within a reasonable degree of certainty. See Farrington v. Richardson, 153 Fla. 907, 915, 16 So.2d 158, 162 (1944); Miller v. Allstate Ins. Co., 573 So.2d 24, 27-28 (Fla. 3d DCA 1990); Restatement (Second) of Contracts § 352 (1981). While we acknowledge the requirement for certainty of damages in a contract action, this court has recognized several modifying doctrines to this rule, which include:
(a) If the fact of damage is proved with certainty, the extent or amount may be left to reasonable inference.
(b) Where the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of the resulting uncertainty.
(c) Mere difficulty in ascertaining the amount of damage is not fatal.
(d) Mathematical precision in fixing the exact amount is not required.
(e) If the best evidence of the damage of which the situation admits is furnished, this is sufficient.
(f) The plaintiff may recover the value of his contract, and this may be measured by the value of the expected profits.
(g) Profits may sometimes be proved as evidence of the damages, when they would not be directly recoverable.
Miller, 573 So.2d at 28 n. 4 (quoting C. McCormick, Damages § 27, at 101-102 (1935)).
The record in this case establishes that but for Sharick's dismissal from the university, he would have obtained his DO degree some two months thereafter. As the fact of Sharick's damage as the result of Southeastern's breach of contract can be proved with certainty, we reverse and remand for a new trial on damages. Upon retrial, Sharick must be afforded the opportunity to plead and prove damages in the form of the loss of earning capacity that would reasonably have resulted had he received his DO degree.
There is testimony in the present record suggesting that Sharick would have been foreclosed from enrolling or graduating elsewhere based upon the timing and nature of his dismissal from Southeastern. See also Horowitz v. Board of Curators, Univ. of Mo., 538 F.2d 1317, 1320-21 (8th Cir.1976)(noting expert testimony that in admissions process expert would lean heavily in favor of candidate who had never been dismissed from graduate school), rev'd on other grounds, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); Greenhill v. Bailey, 519 F.2d 5, 8 n. 6 (8th Cir.1975)(noting concession of defendant educational institution of unlikelihood that student would gain admittance elsewhere). We conclude that this is an appropriate issue for the jury upon retrial. If the jury finds that it is no longer possible for Sharick to obtain a DO degree, then Southeastern would be foreclosed from complaining of the resulting uncertainty in proof of damage caused by its wrongful actions. See Miller, 573 So.2d at 28. Furthermore, there is evidence from which a jury could reasonably conclude that but for the wrongful deprivation of this degree, Sharick would have been able to practice in some capacity as a doctor of osteopathy.[2]
*141 In the analogous context of lost prospective profits, the Florida Supreme Court has determined that where there is a "yardstick" by which such profits can be measured, they are allowed if proven. See W.W. Gay Mechanical Contractor, Inc. v. Wharfside Two, Ltd., 545 So.2d 1348, 1350 (Fla.1989)(quoting Twyman v. Roell, 123 Fla. 2, 6, 166 So. 215, 217 (1936)).

The "uncertainty which defeats recovery in such cases" is the cause of the damage rather than the amount. "If from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person." ... The party must prove that 1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined.
Id. at 1350-51. (emphasis added) (citations omitted); R.A. Jones & Sons, Inc. v. Holman, 470 So.2d 60, 69-70 (Fla. 3d DCA 1985) ("Inability to give the exact or precise amount of damages does not preclude recovery so long as there is a reasonable basis in the evidence for the amount awarded"); see also Miller, 573 So.2d at 28-29. Accordingly, the extent or amount of the resulting impairment to Sharick's earning capacity may be determined by a jury based upon reasonable inference. Upon retrial, both parties are free to present evidence as to what impact Sharick's academic and clinical performance may have had upon his ultimate success as an osteopathic physician.[3]
Alternatively, we recognize the potential for mitigation of damages if Sharick fails to establish that it would be impossible for him to obtain a DO degree at another institution. In that event, the appropriate measure of damages would only be the reproduction cost of acquiring the degree elsewhere. This would include a calculation of the present value of his lost income during the time period needed to acquire the degree, coupled with the tuition and associated costs incurred at the new school. See generally Russell v. Salve Regina College, 890 F.2d 484 (1st Cir.1989)(upholding $25,000 damage award to nursing student wrongfully expelled by school which was equivalent to lost salary for year in which her education was delayed); rev'd on other grounds, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), damages reinstated on remand, 938 F.2d 315 (1st Cir.1991); Fussell v. Louisiana Bus. College of Monroe, Inc., 519 So.2d 384, 387-88 (La.Ct.App.1988).
Accordingly, this case is reversed and remanded for a new trial on damages consistent with this opinion.
NOTES
[1] In recognition of the deference that courts must give to educational institutions, which are uniquely qualified by training and experience to measure the academic performance of their students, this court has previously held that the alternative remedies of specific performance and mandamus are unavailable to compel the granting of a degree where an educational institution had exercised its discretion in refusing to confer such. See Militana, 236 So.2d at 164; Robinson v. University of Miami, 100 So.2d 442, 444-45 (Fla. 3d DCA 1958).
[2] Sharick testified that his goal was to be a family practitioner. Dr. Howard Neer, Associate Dean of Clinical Affairs, testified that he began practicing in 1954 upon finishing such a one year postgraduate internship. While Dr. Neer stated that today it would ordinarily be necessary to go through an additional residency prior to practice, he testified that a 1993 graduate of Southeastern who completed a one year training program after graduation would be eligible to get a Florida license to practice medicine and also acknowledged that a graduate of Southeastern would already be qualified to serve in positions such as a pathologist, medical administrator, medical examiner in a rural community or a disability or workers compensation hearing officer.
[3] Prior to medical school, Sharick received a bachelor of science degree in chemistry from Furman University and graduated magna cum laude and Phi Beta Kappa. He then worked for a couple of years as a chemist for Union Carbide Corporation. A December 17, 1992 letter of evaluation from Dean Matthew Terry indicated that prior to the Clewiston rotation Sharick had a satisfactory cumulative grade point average of 83.2%, a clinical rotations average of 84.9%, a class rank of 75/104 students and was expected to graduate in May 1993. Sharick had also already passed Part 1 of the examination of the National Board of Osteopathic Medical Examiners and had entered into a contract for a one year post graduate internship.