[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 4, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-11931

_____

D. C. Docket No. 01-07160-CV-JIC

HGI ASSOCIATES, INC.,

Plaintiff-Appellant
Cross-Appellee,

versus

WETMORE PRINTING COMPANY,
a Texas corporation,

Defendant-Appellee
Cross-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(October 4, 2005)

Before BIRCH, CARNES and HILL, Circuit Judges.

BIRCH, Circuit Judge:

In this appeal, we determine whether Wetmore Printing Company ("Wetmore") improperly breached its contracts to sell Microsoft software to HGI Associates, Inc. ("HGI"), and, if so, what damages HGI can properly recover from Wetmore. After a bench trial, the district court found that Wetmore formed and breached three of four putative contracts with HGI, that HGI was entitled to accrued lost profits but no future lost profits caused by the breach, and that HGI was entitled to punitive damages due to the knowingly fraudulent actions Wetmore undertook when forming and later breaching those contracts. We **AFFIRM** in part and **VACATE** and **REMAND** in part.

## I. BACKGROUND

In this case, the Microsoft Corporation ("Microsoft"), through its subsidiary, Microsoft Licensing, Inc. ("MSLI"), and business partner, Wetmore, attempted to set an ill-conceived trap to ensnare a suspected software pirate, HGI. The trap, however, only managed to ensnare Wetmore. From the district court's findings of fact, we can summarize the relevant facts as follows.

HGI is a reseller of computer software and hardware that purchases software in the secondary market because the costs of obtaining software through authorized

2

distribution channels are prohibitive. Other than the contracts involved here, HGI never purchased or distributed software through any manufacturer's authorized distribution channels. HGI's president, Ronald Swartz, has worked for HGI since 1993 and is responsible for all of HGI's acquisition and distribution of software, and he approves all purchases and sales.

At all times relevant to this appeal, Wetmore was an authorized replicator ("AR") for Microsoft's original equipment manufacturer ("OEM") distribution channel. Wetmore was authorized by Microsoft to sell Microsoft software kits[1] to approved Microsoft distributors or licensees. Wetmore's customers include OEMs and authorized distributors ("AD") such as Compaq, Wal-Mart, and JCPenney. Wetmore sells its software kits for approximately $2.50 each; however, after the sale, Wetmore notifies MSLI, who then charges the OEMs and ADs a separate licensing fee. The $2.50 price for the software kits does not include any licencing or royalty fees.

In February of 2001, Swartz contacted Wetmore and inquired about purchasing Microsoft software. After the initial contact, Wetmore notified MSLI about HGI's interest. MSLI requested that Wetmore help it investigate HGI's activities because Microsoft believed HGI was illegally selling unlicensed

---

[1]A software "kit" includes a copy of the requested Microsoft software on compact disc, a printed manual, and a certificate of authenticity.

software.   Before any further contact or transactions, both MSLI and Wetmore knew that HGI was not an AD for Microsoft.

Despite this knowledge, Wetmore invited Swartz to its Houston, Texas facility on 26 February 2001.  While in Houston, Swartz met Wetmore's Sales Manager, Steven Herbst; Wetmore's Director of Operations, Karl Kluetz; Wetmore's Sales Support Manager, Todd Bond; and Wetmore's project manager that would be assigned to HGI, Shane Hatler.  During the visit, Swartz toured the facility, was given a credit application, and told that Wetmore would supply specific Microsoft pricing and part numbers.

Wetmore's representatives let Swartz believe that he could buy Microsoft products from Wetmore even though it knew HGI was not an authorized Microsoft dealer, and they did so with no intention to establish a "bona fide business relationship with HGI." R5-189 at 6.  Wetmore was only pretending to do business with HGI in order to assist in Microsoft's investigation.

Furthermore, Mark Roenigk, MSLI's Director of OEM Operations, asked Wetmore to record its meetings with Swartz, and he proposed a list of questions to ask Swartz in order to, among other things, "'get Mr. Schwartz [sic] to admit that what he is doing is not a licensed/legal way to distribute [Microsoft] products.'" Id. at 6-7.  During the meetings with Swartz, Wetmore asked whether HGI was

4

licensed by Microsoft to sell its software. The district court found that Swartz "replied that he was not licensed and stated that he did not believe HGI was required to have a license to sell Microsoft products because HGI was only a reseller." Id. at 7. Moreover, the court also found that "Swartz stressed his concern that any Microsoft products purchased by HGI be authentic Microsoft software." Id. Both Wetmore and MSLI knew that their actions were designed to deceive Swartz into believing HGI would become a legitimate customer of Wetmore and free to order Microsoft software.

On 2 March 2001, Swartz submitted his credit application to Wetmore, which then shared it with MSLI. Wetmore's project manager, Hatler, then e-mailed price lists of various Microsoft software to Swartz and copied MSLI noting the prices sent to HGI. On or about 7 March 2001, Swartz requested that Wetmore send samples of the software. Wetmore sent the samples with MSLI's full knowledge and under the pretense that Wetmore was "willing and able to carry on a legitimate business relationship" with HGI. Id. at 8.

On 9 March 2001, Hatler told Swartz that Wetmore could begin taking HGI's purchase orders for Microsoft software. Several days later, Hatler notified Swartz that Wetmore could deliver 300 software kits to HGI. HGI ordered the 300 kits on 14 March 2001 and Wetmore accepted. MSLI was informed of the sale and

5

requested descriptions of the 300 units shipped to HGI. Wetmore completely filled the order for 300 units on 15 March 2001. On the same day, HGI ordered the 300 kits, HGI also submitted purchase order 01-0314-107 ("107") for 72,500 Microsoft kits and purchase order 01-0314-108 ("108") for 41,000. Swartz was told that Wetmore would have to "'go to press on [those] orders.'" Id. at 9. When Wetmore notified MSLI of the additional orders, MSLI responded by e-mail saying, "'Thanks. Sounds like a plan.'" Id. On 15 March 2001, Swartz placed an additional purchase order 01-315-101 ("101") for 11,000 kits.

On 26 March 2001 Wetmore confirmed the orders and confirmed that it could make a partial shipment[2] of orders 107 and 108 in three days. For the remaining balance of the purchase orders 107, 108, and 101, Wetmore's sales manager, Herbst, told Swartz, "'[a]s soon as I get more information on when we can ship the balance of your requirements, I'll let you know.'" Id. at 10. Thus, Wetmore confirmed that it would fill the purchase orders and made no indication that HGI was not authorized to purchase the software.

In order to prepare for the incoming shipments, HGI leased warehouse space in Colorado for 3 years. On 29 March 2001, HGI received the partial shipments of order 107 and 108 at the Colorado facility; however, the shipments were non-

---

[2]Wetmore indicated it could supply 2,000 kits for order 107 and 2,000 kits for order 108.

conforming because they were branded with a Compaq logo and not generic as requested. Further, the shipment was missing manuals for some of the kits. Wetmore shipped the missing manuals to HGI; however, it shipped them to HGI's Florida address at the request of MSLI because MSLI wanted to locate HGI's warehouse there.

Wetmore treated HGI as a legitimate client. It invoiced HGI for the completed orders, and HGI paid all invoices in full. Wetmore's invoices showed HGI as customer number 2149. Furthermore, MSLI showed Wetmore employees how to enter HGI's orders into MSLI's Orion system for tracking royalty payment.

On 3 April 2001, HGI placed another order with Wetmore for 149,500 kits, but this order was never confirmed. Due to pressure from HGI's customers, Swartz tried to contact Wetmore's representatives to check the status of his orders on 12 April 2001. Several days later, on 17 April 2001, Wetmore indicated that it could no longer supply HGI with Microsoft software because HGI was not an authorized Microsoft distributor. Wetmore told HGI that there had been a mistake and asked HGI to return the prior shipments for a full refund. After this communication, Swartz and HGI had no further contact with anyone at Wetmore.

The district court summarized its findings stating that before 17 April 2001, "(1) Wetmore never informed HGI that it could not or would not provide Microsoft

7

products to HGI; (2) never stated to HGI that HGI was required to be an authorized Microsoft dealer; and (3) never stated to HGI that HGI was required to enter a licensing agreement with Microsoft." Id. at 13. Furthermore the district court found that

> Wetmore engaged in a pattern and practice of blatantly false, deceptive and manipulative dealings and misrepresentations to HGI by: (1) confirming HGI's purchase orders; (2) promising to ship outstanding requirements that had been ordered; (3) advising HGI that it would go to press on other products; (4) shipping products to HGI; (5) invoicing HGI; and (6) accepting payment from HGI, all prior to Wetmore's so-called "mistake." At all relevant times, HGI justifiably believed that the pricing provided to it by Wetmore included any royalty that may have been due MSLI, if any, and that HGI was not liable to MSLI for payment of royalties of any Microsoft product purchased from Wetmore.

Id. at 13-14.

In its legal conclusions, the trial court held that of the four alleged contracts in dispute here, three were valid and binding contracts. Orders 107, 108 and 101 were valid, however, HGI's final purchase order was not a valid contract because it was never confirmed by Wetmore. After the court held that the contracts were valid, the court also held that Wetmore "committed a material breach of each of the three contracts by repudiating its obligations thereunder." Id. at 23. The district court further held that Wetmore breached its obligation to act in good faith, pursuant to U.C.C. §§ 1-203 and 1-201(18), when Wetmore told HGI there had been a "mistake." Because Wetmore knew HGI was not an authorized dealer of

8

Microsoft software from the beginning, there was in fact no "mistake." Thus, the trial court began its analysis of the damage award owed to HGI.

First, the district court found that Wetmore owed HGI for any accrued lost profits from its breach of the contracts. The court estimated that HGI had outstanding orders from customers totaling $815,000 in revenue. Given that HGI's cost to buy this product from Wetmore would have been $58,590, the district court awarded the difference of $756,410 to HGI as lost profits. Furthermore, the district court found that HGI rented warehouse space in anticipation of Wetmore's delivery. The present value of the lease payments, $55,323, was also awarded to HGI, making a total award of $811,733 plus prejudgment interest to HGI for Wetmore's breach of contract.

Second, the district court considered HGI's claim for future lost profits. According to HGI's expert, HGI sustained lost profits and future lost profits of approximately $16.7 million. The court, however, found that the claim for future lost profits "that have not accumulated prior to the trial of this matter cannot be proven with a reasonable degree of certainty as they are entirely speculative and conjectural." Id. at 29. Thus, the district court did not award additional future lost profits to HGI.

Third, the district court found that Wetmore's actions resulted in fraud in the inducement. Wetmore's fraudulent misrepresentations to HGI that led HGI to justifiably believe it was purchasing royalty-free software from Wetmore injured HGI. However, the district court found that, because the damages sustained by HGI's breach of contract and fraudulent inducement claims were the same under Florida law, no additional damages would be awarded for the fraud claim.

Fourth, the district court awarded to HGI $50,000 in punitive damages because Wetmore "intentionally pursued a course of wrongful conduct." Id. at 35. The court found by clear and convincing evidence that Wetmore "engaged in and knowingly condoned and ratified fraudulent actions so reckless as to constitute a conscious disregard or indifference to HGI's business," and therefore, a punitive damage award was warranted. Id. at 34.

## II. DISCUSSION[3]

On appeal of a district court order from a bench trial, we review the court's conclusions of law de novo and its findings of fact for clear error. See A.I.G. Uru. Compania de Seguros, S.A. v. AAA Cooper Transp., 334 F.3d 997, 1003 (11th Cir.

---

[3]The district court, applying Florida conflicts of law rules, see In re Santos, 648 So. 2d 277, 280 (Fla. Dist. Ct. App. 1995), found that Texas law controlled questions of contract formation, interpretation, and validity because the contract was formed in Texas at Wetmore's location. However, the court applied Florida law, see Gregg v. U.S. Indus., Inc., 887 F.2d 1462, 1465 n.1 (11th Cir. 1989), to questions of remedies and damages. Finding no error in this application of law, we will apply the same bodies of law in our analysis here.

2003).  We will not upset a district court's finding of fact unless it is "clearly erroneous."  FED. R. CIV. P. 52(a).  By that standard, we may reverse the district court's findings of fact if after viewing all the evidence we are "left with the definite and firm conviction that a mistake has been committed."  United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948).

Here, both parties argue that the district court erred.  Wetmore argues that the district court improperly upheld the contracts' validity because they violate public policy, the district court improperly applied the doctrine of waiver to MSLI's rights in the software, and the district court erred by awarding punitive damages to HGI.  On the other hand, HGI argues that the district court erred by not allowing damages for future lost profits.  We now consider each of these arguments in turn.

A.    Contract Validity

1. Public Policy Violation

Wetmore argues that the district court erred by finding the contracts were valid and any intellectual property rights waived because the contracts were in violation of public policy.  Essentially, their argument is that the undelivered software Wetmore would have provided was not licensed or authorized by Microsoft; therefore, HGI's resales of that software would violate Microsoft's

11

copyrights and the public policy to protect those rights. However, Wetmore's analysis of the circumstances here is incorrect.

There is no violation of public policy here because the contract entered into by HGI called for software that was already licensed and authorized by Microsoft. According to the findings of fact by the district court, which we conclude are supported by sufficient evidence in the record and are not clearly erroneous, at all times HGI "justifiably believed that the pricing provided by Wetmore included any royalty that may have been due MSLI, if any, and that HGI was not liable to MSLI for payment of royalties of any Microsoft products purchased from Wetmore." R5-189 at 14. Further, the court found that "there was nothing in the contracts that contemplated circumvention of Microsoft's intellectual property rights." Id. at 19. Thus, by Wetmore's deception, the contracts it formed with HGI required Wetmore to supply Microsoft software that did not violate Microsoft's intellectual property rights and was approved, and even encouraged, by Microsoft.

Viewing Wetmore's contractual obligations in this light, we do not agree with its public policy argument. Essentially, Wetmore asks us to invalidate a contract requiring it to deliver lawful and approved goods because the goods it could supply were, in fact, not lawful or approved goods. This we cannot do.

Under Texas law, parties may contract so "long as their agreement does not violate the law or public policy." In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 129 (Tex. 2004). We cannot find any requirement in the contract between Wetmore and HGI that would violate law or public policy. The contract here is an agreement to purchase licensed and approved software. Unless otherwise agreed, HGI had a right under Texas law to presume that it would take possession of the software with no further claims of infringement by a third party. See TEX. BUS. & COM. CODE ANN. § 2.312(c); see also Doyle v. Harben, 660 S.W.2d 586, 589 (Tex. App. 1983) (finding an innocent seller of a stolen vehicle was liable to buyer for breach of § 2.312 warranties when the vehicle was confiscated by the state). Although Wetmore knew its software kits did not include royalty payments to Microsoft, and Wetmore knew HGI was buying the software kits with the understanding that it had no obligations to pay royalties; Wetmore continued to mislead HGI by treating HGI as an approved customer and failing to correct the belief that the software was royalty-free. Though the violation of intellectual property rights is of great concern to public policy, it was not contemplated by this contract. [4]

---

[4]We find it further damaging to Wetmore's position that despite having full knowledge of the sales to HGI and the misrepresentations by Wetmore, MSLI failed to assert any of its intellectual property rights or issue cease and desist letters either before or after repudiation of the contracts.

13

Instead, we find that Wetmore's position is a greater threat to public policy and contract law in general. As an example, suppose that two parties form a contract to purchase a car with the expressed understanding that the seller has the rights to sell that car to the buyer. In other words, the seller is not selling a stolen car to the buyer. The seller cannot, then, intentionally avoid his contractual liability to sell a car by claiming that the car he would have sold buyer was in fact stolen and thus an illegal contract that violates public policy. The agreement was not for the purchase of a stolen car, which would violate the law and public policy, but for a legitimately-owned car. Similarly here, HGI contracted to purchase Microsoft software with the understanding that there were no further royalties due on that software. Wetmore, although knowing its typical products required additional royalty payments, intentionally misled HGI into believing it would receive royalty-free software licensed by Microsoft. It cannot now circumvent this valid contractual obligation to HGI. Wetmore's argument that the contract violates public policy fails because the actual contract created did not violate Microsoft's rights or public policy.

2. Waiver of MSLI's Rights

Next, Wetmore contends that even if the contracts do not violate public policy, the trial court misapplied the copyright waiver doctrine by waiving

14

Microsoft's rights in the undelivered software. Wetmore argues that MSLI only waived its right to the software that had already been delivered, however, Microsoft did not waive its rights to the undelivered software because it never approved of the sale by Wetmore. Thus, under the doctrine of copyright waiver Wetmore argues that "Microsoft's conduct does not amount to the type of clear, decisive, and unequivocal conduct that manifests an intent to waive its rights." Appellee's Answer Br. at 26.

Considering our holding in the previous section and the district court's finding that Wetmore intentionally misled HGI into believing it was purchasing royalty-free software, we strain to understand the relevance of Wetmore's decision to defend itself with Microsoft's intellectual property rights. Nevertheless, we do not strain to answer its arguments. Here, the actions of both Wetmore and MSLI warrant the estoppel[5] of any applicable copyright claims either may have in the undelivered software.

Copyright estoppel applies when the alleged infringer can show that (1) the copyright owner knew the facts of the infringement, (2) the copyright owner intended its conduct to be acted upon or the copyright owner acted such that the

_____

[5]Though the district court applied the doctrine of waiver, we find that the doctrine of copyright estoppel, a similar doctrine, is more appropriate to the facts and discussion of this case.

15

alleged infringer has a right to believe it was so intended, (3) the alleged infringer is ignorant of the true facts, and (4) the alleged infringer relies on the copyright owner's conduct to his detriment. See Carson v. Dynegy, Inc., 344 F.3d 446, 453 (5th Cir. 2003); Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104 (9th Cir. 1960). A copyright owner cannot only be estopped through its words and actions but also through its own silence and inaction. See Carson, 344 F.3d at 453; Hampton, 279 F.2d at 104. Here, all four conditions are met. First, both Wetmore and MSLI knew that HGI was seeking to purchase Microsoft software from Wetmore and that HGI did not have a licensing agreement or approval to distribute from Microsoft. Second, both Wetmore and MSLI intended HGI to place orders for the software once HGI was allowed to do so, and they intentionally misled HGI regarding its ability to purchased approved software.

Third, as the district court found, HGI justifiably believed that Wetmore's software kits would include any and all royalty payments to Microsoft. HGI was ignorant as to any further royalty payments required, and both Wetmore and MSLI were silent when HGI asserted its belief that it would not need a license from Microsoft to purchase the software from Wetmore. Not only was HGI legitimately ignorant of the fact it might be infringing Microsoft's rights, both Wetmore and MSLI knew of this ignorance and actively sought to induce it.

16

Fourth, HGI relied on Wetmore's conduct and the conduct of MSLI acting through Wetmore's agents to its detriment. After relying on Wetmore's assertions that it could deliver the software, HGI placed purchase orders for numerous software kits, rented warehouse space in Colorado for three years, and proceeded to accept orders from customers for the software. These outstanding obligations were all formed on the basis of Wetmore's and MSLI's fraudulent conduct and HGI's subsequent reliance. Thus, the doctrine of copyright estoppel applies to any possible claim by Wetmore that Microsoft's copyrights were violated.

B.     Punitive Damages

Next, Wetmore argues that the district court's award of punitive damages was improper. Specifically, it argues that Texas law requires a separate and distinct injury in order to prove fraud in the inducement, see Camp v. Ruffin, 30 F.3d 37, 38 (5th Cir. 1994) (per curiam), and, that, even if the fraud claim is allowed, Florida law does not allow the award of punitive damages when the compensatory damages for both the breach of contract and fraud claim compensate for the same injuries, see Kee v. Nat'l Reserve Life Ins. Co., 918 F.2d 1538, 1543 (11th Cir. 1990) ("'Where the compensatory damages requested in a count for tort are identical to the compensatory damages sought in a count for breach of contract, compensatory damages and punitive damages for the tort are not recoverable.'").

17

First, to the extent Camp prevents a fraudulent inducement claim where the parties also allege the same damages under breach of contract,[6] that holding has been expressly rejected by the Texas Supreme Court's 1998 decision in Formosa Plastics Corp. v. Presidio Engineers and Contractors, Inc., 960 S.W.2d 41 (Tex. 1998). In Formosa Plastics the Texas Supreme Court resolved a dispute of this issue between the various Texas appellate courts and federal court decisions. See id. at 46. The court held that tort damages for a fraudulent inducement claim are recoverable "irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." Id. at 47. Furthermore, the court stated that a decision "[a]llowing the recovery of fraud damages . . . only when a plaintiff suffers an injury that is distinct from the economic losses recoverable under breach of contract claim is inconsistent" with Texas law and ignores the "independent legal duty . . . preclud[ing] the use of fraud to induce a binding agreement." Id. Thus, the idea that Texas law does not allow fraudulent inducement claims with injuries that are separate and distinct from breach of contract losses is incorrect.

---

[6]In Camp, the court noted that the plaintiff brought claims for fraud and negligent misrepresentation, and the complaint did not state a claim for breach of contract. 30 F.3d at 37-38.

18

Second, from our review of Florida damages law, we conclude that punitive damages are awardable for sufficient fraudulent inducement claims, even when those claims involve facts related to a collateral breach of contract claim. The general rule in Florida states that punitive damages are not awarded for breach of contract claims. See, e.g., Griffith v. Shamrock Vill., Inc., 94 So. 2d 854, 858 (Fla. 1957). However, "where the acts constituting a breach of contract also amount to a cause of action in tort there may be a recovery of exemplary damages upon proper allegations and proof." Id.; accord Ferguson Transp., Inc. v. N. Am. Van Lines, Inc., 687 So. 2d 821, 822-23 (Fla. 1996) (per curiam); S. Bell Tel. & Tel. Co. v. Hanft, 436 So. 2d 40, 42 (Fla. 1983); see also Kee, 918 F.2d at 1543. The underlying tort cause of action must be based on some sort of "intentional wrong, willful or wanton misconduct, or culpable negligence, the extent of which amounts to an independent tort." Hanft, 436 So. 2d at 42.

Wetmore relies on our decision in Kee to assert that punitive damages are not recoverable when the compensatory damages for the breach of contract and fraudulent inducement are the same. That reasoning, however, has been rejected in fraudulent inducement cases. In Kee, we based much of our decision on the Florida Supreme Court's holding in AFM Corp. v. Southern Bell Telephone & Telegraph Co. that stated, "without some conduct resulting in personal injury or

19

property damage, there can be no independent tort flowing from a contractual breach which would justify a tort claim solely for economic losses." 515 So. 2d 180, 181-82 (Fla. 1987); accord Kee, 918 F.2d at 1543. The Florida Supreme Court, however, has subsequently rejected the use of this language to eliminate a legitimate fraudulent inducement cause of action on the sole basis that breach-of-contract claims recover for the same alleged economic injuries. See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So. 2d 1238, 1239 (Fla. 1996).

In HTP, the court resolved a conflict between the Florida Courts of Appeal regarding whether a claim of fraudulent inducement is barred in a breach of contract action. See id. at 1238. The court held that a fraudulent inducement is a separate and independent tort when compared to breach of contract. See id. at 1239. The facts concerning fraud committed during the formation of a contract can be distinguished from the facts resulting in the breach of that contract. See id. Thus, an "action on a contract and for fraud in inducing plaintiff to enter into such a contract may exist at the same time, and a recovery on one of the causes will not bar a subsequent action on the other." Id. (citations and quotations omitted).

Florida courts have further explained that the decision in HTP allows an award of punitive damages for fraudulent inducement despite additional claims for breach of contract. See Conn. Gen. Life Ins. Co. v. Jones, 764 So. 2d 677, 680-82.

20

(Fla. Dist. Ct. App. 2000).[7]  Indeed, even we have recognized the ability of a party

to seek punitive damages for fraud and compensatory damages for breach of

contract under Florida law, despite both claims arising from the same facts.  See

Palm Beach Atl. Coll., Inc. v. First United Fund, Ltd., 928 F.2d 1538, 1547 (11th

Cir. 1991).  Thus, we conclude that the district court properly granted punitive

damages for the acts of fraud perpetuated by Wetmore.

C.    Lost Profits

Finally, HGI appeals the decision of the district court denying its claim for

future lost profits on the undelivered software.  The district court granted damages

to HGI for any accrued profits it incurred from resale contracts it had outstanding

at the time of the breach.  For the undelivered software that did not have

outstanding resale contracts at the time of the breach, the district court did not

award damages to HGI because such profits would be too speculative and

---

[7]In Jones the court noted that even though a fraudulent inducement claim, whether frivolous or not, will be tempting in any breach of contract case given the potential for punitive damages recovery, it is still an independent tort claim requiring sufficient proof of all the elements of fraud in addition to the contract claims.  See id. at 682.

conjectural.[8]  However, the district court's application of Florida law here was in error.

This award of damages comes to us in a rather unique posture.  A damage award for breach of contract for the sale of goods is typically covered by section 672.713 of Florida's version of the Uniform Commercial Code ("UCC"), FLA. STAT. § 672.713.  In that section, "the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages . . . , but less expenses saved in consequence of the seller's breach."  FLA. STAT. § 672.713(1); U.C.C. § 2-713(1); accord Weigert v. Trade Wind Ventures, Inc., 667 So. 2d 913, 914 (Fla. Dist. Ct. App. 1996) (per curiam); Kneale v. Jay Ben Inc., 527 So. 2d 917, 918 (Fla. Dist. Ct. App. 1988); see also Hart v. Marbury, 90 So. 173, 175 (Fla. 1921).  Here however, the district court found that HGI failed to sufficiently plead section 672.713 "benefit of the bargain" damages and only pled lost profit damages under FLA.

---

[8]On appeal, the parties argue whether the district court's denial of future lost profits is a finding of fact or a conclusion of law.  The court held that "lost profits that have not accumulated prior to the trial of this matter cannot be proven with a reasonable degree of certainty as they are entirely speculative and conjectural." R5-189 at 29.  Considering the location of this phrase in the "Conclusions of Law" section of the order, the use of "speculative and conjectural" and "reasonably certain" that are widely used terms of art in Florida law, and the short and straightforward denial of all profits that have not accumulated, we hold that this was a legal conclusion of the trial court.

STAT. § 672.715(2). The parties do not dispute this decision on appeal, and we will not disturb the district court's ruling. Instead, we analyze whether the district court properly applied Florida contract law to HGI's claim that it lost profits from the resale of Microsoft software it contracted for when Wetmore repudiated the three contracts.

Florida's UCC law allows HGI to recover for any incidental[9] damages and consequential damages. See FLA. STAT. § 672.715. Consequential damages are awardable for "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." FLA. STAT. § 672.715(2)(a). Lost profits typically fall under the category of consequential damages and we have applied § 672.715 to similar lost profit claims. See Nyquist v. Randall, 819 F.2d 1014, 1017 (11th Cir. 1987). In Nyquist we interpreted § 672.715(2) to mean

> that (1) "consequential damages" are those damages "resulting from general or particular needs" of the purchaser, (2) such damages are not recoverable unless "the seller at the time of contracting had reason to know" of the possibility that they would occur, and (3) such damages are not recoverable unless they "could not reasonably be prevented by cover or otherwise."

---

[9]We do not disturb the finding of the district court that HGI incurred incidental damages by leasing the warehouse space for storage of the software shipment. The issue has not been raised by the parties and we see no error in that award here.

819 F.2d at 1018. Though there is a general rule in Florida to avoid lost profit damages because they can be too speculative and conjectural, see Levitt-Ansca Towne Park P'ship v. Smith & Co., 873 So. 2d 392, 396 (Fla. Dist. Ct. App. 2004); A&P Bakery Supply & Equip. Co. v. Hawatmeh, 388 So. 2d 1071, 1072 (Fla. Dist. Ct. App. 1980), they can be recovered if (1) the breaching party caused the loss; and (2) the amount of such damages can be adequately determined by some standard, see W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So. 2d 1348, 1350-51 (Fla. 1989); Twyman v. Roell, 166 So. 215, 217 (Fla. 1936); Sostchin v. Doll Enters., Inc., 847 So. 2d 1123, 1128 (Fla. Dist. Ct. App. 2003); Forest's Mens Shop v. Schmidt, 536 So. 2d 334, 336 (Fla. Dist. Ct. App. 1988). "Lost Profits must be established with a reasonable degree of certainty and must be the natural consequence of the wrong." Sostchin, 847 So. 2d at 1128; accord Twyman, 166 So. at 217. Thus, in order to recover for lost profits here, the district court must consider whether (1) the seller's breach naturally caused (2) the buyer to suffer damages arising from the buyer's general or particular needs that (3) the seller had reason to know of at the time of contracting, and (4) those damages can be proven to a reasonable certainty, but (5) the buyer could not have prevented them by cover or otherwise.

24

The uncertainty and speculative nature of lost profits that generally defeats their recovery in contract cases refers to the cause of that damage and not the amount of the damage. See Twyman, 166 So. 2d at 218; Sharick v. Southeastern Univ. of the Health Scis., Inc., 780 So. 136, 141 (Fla. Dist. Ct. App. 2000). The amount of loss does not have to be proven with mathematical precision, see id. at 140, and may be estimated "in any manner which is reasonable under the circumstances." U.C.C. § 2-715 cmt. 4. Even though a court should strive to calculate contract damages to a certainty, Florida courts have noted that this rule has been modified and a "plaintiff may recover the value of his contract, and this may be measured by the value of the expected profits." Sharick, 780 So. 2d at 140.

In Twyman, the Florida Supreme Court allowed a farmer to recover for lost profits on a crop of English peas against an investor. The parties had entered a contract whereby the investor supplied a majority of the funding for planting the crop, the farmer supplied the labor to plant the crop, and they both split the profits. Twyman, 166 So. at 216. During the second year of the contract period, the investor failed to supply the required funds and no crop was planted. Id. The Florida Supreme Court reversed the lower court's finding that the lost profits on the crop not planted was too speculative and conjectural. Id. at 217. The court held that although the crop was never planted and the actual yield would never be

25

known, it was still possible to estimate the crop's yield from average crop yields of English peas that year on similar land. Id. at 218. Because the investor had a reason to know of the possibility of lost profits and his breach caused the loss, the court did not deny the farmer's claim because the actual crop yield and profit would not be known. The court allowed a lost profit award because there was sufficient evidence to estimate the lost profits with reasonable certainty. Id. at 217-18.

Conversely, in Schmidt the Florida Court of Appeals denied a lost profit claim where a shop tenant claimed lost profits after the landlord repudiated a lease for additional shop space. 536 So. 2d at 335. There, the shop tenant claimed that because it was not allowed to expand into the additional space, it lost profits. Id. However, the court held that this was too speculative and conjectural because the store had not posted a profit in two years and actually lost money as sales increased. Id. at 336. Thus, it was in the realm of speculation and conjecture that the lease of space would have increased profits and that the landlord's repudiation caused the tenant to lose prospective profits.

Here, there is sufficient evidence to show that Wetmore's repudiation of the three software contracts directly caused HGI's loss of future profits from its resale of that software. Profits lost when a buyer cannot resell the goods it contracted for

26

with seller are directly linked to the seller's repudiation of the contract and are not too speculative and conjectural to be determined here. Though there may be some speculation as to how much HGI could have sold and at what price, this is no different than the crop of English peas in <u>Twyman</u>. There is enough of a market for Microsoft software to determine the average resale amount and price for a company in a position similar to HGI.

Further, Wetmore had reason to know when it formed the contracts that HGI was a reseller. The district court found that Swartz told Wetmore's representatives "that he did not believe HGI was required to have a license to sell Microsoft products because HGI was only a <u>reseller</u>." R5-189 at 7 (emphasis added). Further, the fact that HGI was buying in such large quantities and that most, if not all, of Wetmore's clients resold the software they bought, gave Wetmore reason to know HGI was attempting to resell the goods at a profit. "In the case of sales of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know within the meaning of subsection (2)(a)." U.C.C. § 2-715 cmt. 6.

On remand, the district court must decide whether the evidence already of record is sufficient to meet HGI's burden as we have defined that burden. The evidence must show the amount of lost profits from HGI's breached contracts with

27

Wetmore to a reasonable certainty.[10]  To do so, the parties should focus on record evidence of other similar software resellers, if any, including their ability to sell a similar amount of Microsoft software, the price at which such software can be resold, and expenses they would incur from selling such software.[11]  From this evidence, the court can determine HGI's lost profits with a reasonable certainty.

Wetmore, on the other hand, should focus on evidence of HGI's ability to cover and mitigate damages, if any.  In order to collect lost profits, HGI's failure to cover the breach must have been reasonable under the circumstances.  According to § 672.715 (2)(a), we must limit HGI's lost profits recovery unless it could not reasonably have prevented the loss by cover or otherwise.  See Nyquist, 819 F.2d at 1019; see also U.C.C. § 2-715 cmt. 2.  While it appears from the record that HGI did not attempt to cover, this is not fatal to its claim for lost profits.  On remand, Wetmore must  focus on record evidence sufficient to show that its failure to cover was unreasonable under the circumstances.  See Simeone v. First Bank Nat'l Assoc., 73 F.3d 184, 189 (8th Cir. 1996) ("The burden of proof rests with the seller

---

[10]Any profits HGI may have made outside of reselling the software kits that were the subject of the three contracts Wetmore breached is not at issue here.  We remand to the district court with instructions to only consider profits HGI would be reasonably certain to make on reselling the software kits Wetmore agreed to provide in the three contracts with HGI.

[11]As explained earlier in this opinion, Wetmore contracted to sell HGI royalty-free software.  Thus, the cost of royalty payments to Microsoft are not a part of expense HGI would incur in order to resell the software.

to establish that the buyer acted unreasonably in failing to prevent his own loss."). In the past, courts have not required the buyer to attempt cover when his financial situation prevents it, see Nyquist, 819 F.2d at 1018-19; Gerwin v. Southeastern Cal. Assoc. Of Seventh Day Adventists, 14 Cal. App. 3d 209, 219 (1971) ("[A] duty to mitigate does not require an injured party to take measures which are unreasonable or impractical or which require expenditures disproportionate to the loss sought to be avoided or which are beyond his financial means."), or when the goods are scarce, see Simeone, 73 F.3d at 189 (holding that scarcity of rare collectable cars increased the price beyond the buyer's ability to cover at the time of the breach). Thus, the district court must determine whether the facts demonstrate that HGI's failure to cover was justified before awarding any lost profits.

To conclude, on remand the district court must determine the amount of lost profits warranted by the facts of this case. In order to award lost profits the court must determine, to a reasonable certainty, what profits HGI would have made from reselling the software kits Wetmore agreed to provide in the contracts. Further, Wetmore may limit the award of lost profits if it can present sufficient evidence to show that HGI's failure to cover was inexcusable given the circumstances.

29

### III. CONCLUSION

In this case we have considered the appeal and cross-appeal of both HGI and Wetmore arguing that the district court's decision improperly found that Wetmore breached valid contracts to sell HGI software and that the district court improperly awarded damages for those breaches. As we have explained, the district court properly held the contracts to be valid and properly awarded punitive damages, but the court's denial of future lost profits was in error. Thus, we **AFFIRM** the district court's findings of breach of contract and the award of $50,000 in punitive damages, and we **VACATE** the district court's denial of future lost profits and **REMAND** for further proceedings consistent with this opinion.