[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-14904

_____

D.C. Docket No. 6:12-cv-00785-PGB-GJK

SENTINEL CAPITAL ORLANDO, LLC,

Plaintiff-Appellant,

versus

CENTENNIAL BANK,
as successor-in-interest to Old Southern Bank
by asset acquisition from the FDIC as Receiver for Old
Southern Bank,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 20, 2017)

Before WILLIAM PRYOR and ROSENBAUM, Circuit Judges, and UNGARO,[*] District Judge.

PER CURIAM:

This lawsuit arises out of a loan participation agreement that was entered into between The Bankers Bank NA, the predecessor-in-interest of Appellant-Plaintiff, Sentinel Capital Orlando, LLC, and Old Southern Bank, the predecessor-in-interest of Appellee-Defendant, Centennial Bank.  After a three-day bench trial, the district court ruled that Sentinel failed to establish by competent evidence Centennial defaulted under the terms of the participation agreement.  Therefore, Sentinel was not entitled to enforce a repurchase option in the agreement that required Centennial to buy back Sentinel's ownership in the loan under certain circumstances.  While the evidentiary record amply supports the district court's findings of fact and we agree with the ultimate decision in favor of Centennial, we differ as to the legal conclusions applicable to such facts.  Therefore, we affirm on other grounds than those set forth in the district court's order.

## I. BACKGROUND

### A. The Participation Agreement

---

[*] Honorable Ursula Ungaro, United States District Judge for the Southern District of Florida, sitting by designation.

In 2007, The Bankers Bank, NA ("The Bankers Bank") and Old Southern Bank agreed to jointly loan approximately $15,000,000 to Ocoee Golf, LLC (the "Borrower") for the development of a residential community in Ocoee, Florida. On September 26, 2007, The Bankers Bank and Old Southern Bank executed the Participation Agreement (the "Participation Agreement" or the "Agreement"), which sets forth the terms of the joint ownership of the Loan (the "Loan").

As defined in the Participation Agreement, The Bankers Bank was the "Participating Bank," or "Participant," and the majority interest owner, responsible for loaning 56.13% of the Loan principal. Old Southern Bank was the "Originating Bank" and the minority interest holder, responsible for loaning 43.87% of the Loan principal.

On December 30, 2009, Club Docks, LLC assumed The Bankers Bank's interest and became the Participating Bank. Centennial Bank ("Centennial") became the Originating Bank on March 12, 2010, in place of Old Southern Bank. Sentinel Capital Orlando, LLC ("Sentinel") did not acquire its interest in the Participation Agreement from Club Docks until May 26, 2011. It is noteworthy for the purposes of evaluating Sentinel's claims that when Sentinel purchased its interest, the Loan had been in default since before Club Docks had purchased the majority interest and foreclosure proceedings were being prosecuted by

Centennial; most of the conduct that Sentinel complains of in this case occurred prior to its acquisition of the participation interest.

## B. The Borrower's Default on the Loan

On October 4, 2008, the Borrower defaulted on the Loan by failing to make the first payment. At that time, The Bankers Bank and Old Southern Bank were the Participating Bank and Originating Bank, respectively, and a total amount of $5,612,425.26 in loan proceeds had been disbursed to the Borrower.[1] The Borrower never made a payment under the Loan.

## C. Foreclosure Action and Borrower's Offers

On July 1, 2010, approximately four months after acquiring its interest in the Participation Agreement, Centennial initiated a foreclosure action on the Loan. In November 2010, the Borrower and the guarantors presented a settlement offer to Centennial. It is unclear whether this offer was conveyed to Club Docks. Centennial rejected the offer.

On December 6, 2011, a mediation session was held in the foreclosure action between Centennial and the Borrower and the guarantors. Centennial did not inform Sentinel of the mediation, and Centennial did not advise Sentinel that the Borrower made settlement offers that Centennial rejected during the mediation.

---

[1] The Participating Bank had disbursed $3,150,254.30, and the Originating Bank had disbursed $2,462,170.96. No additional monies were disbursed to the Borrower.

4

The Borrower also offered Centennial a deed in lieu of foreclosure.  Centennial rejected the Borrower's offer without advising Sentinel of the offer or its decision.

## D. Third-Party Offers

Centennial also received various third-party offers to purchase the Loan that it rejected.  Encore Housing made an offer on May 18, 2010 to purchase the note or property for $3.8 million, with an expiration date on the offer's face of ten (10) calendar days.  It is unclear whether this offer was conveyed to Club Docks. On July 19, 2010, Centennial received an offer from Ryan Homes for $3.25 million, which Centennial did not communicate to Club Docks.  Three months later, on October 20, 2010, the offer was retransmitted by Ryan Homes to Centennial, but it also was not conveyed to Club Docks.

On June 27, 2011, Centennial received a third offer from Embassy Homes for $3.8 million, which Centennial rejected.  At that point, Sentinel had acquired its majority interest.  Centennial did not convey this offer to Sentinel.

## E. Interest Rate

The Loan documents provide that the interest rate on the Loan may be raised to a default interest rate equal to the maximum allowed under Florida law, which was 25%.  Specifically, the note provides that the standard interest rate "shall" be raised to the default interest rate at "the bank's discretion."  Under the note, the

5

"Bank" was defined as Old Southern Bank, which was Centennial's predecessor-in-interest.

While the foreclosure action was pending, on November 4, 2011, Centennial sent a proposed payoff amount based on 3.75%, the standard interest rate. On November 8, 2011, Sentinel sent correspondence to Centennial asking Centennial why the default interest rate was not utilized in calculating the proposed payoff amount. Thereafter, on November 9, 2011, Centennial sent a proposed payoff amount based on the 25% default interest.

The interest rate issue was not raised again until May 6, 2013, when the parties were finalizing a high-bid sale of the foreclosure judgment, presumably for the purpose of establishing the amount of the deficiency judgment against the Borrower and the guarantors. At that time, Sentinel directed Centennial to charge the 25% default interest rate, but Centennial refused.

Notwithstanding the disagreement as to the interest rate, on May 9, 2013, Sentinel warned Centennial that time was of the essence and directed Centennial to move forward with the foreclosure transaction with Sentinel's full reservation of rights of all claims. To facilitate resolution of the Loan foreclosure litigation, Sentinel and Centennial entered into a Stipulation, Non-Waiver, and Consent Agreement that preserved all claims, notwithstanding the high-bid sale. The

6

Stipulation, Non-Waiver, and Consent Agreement preserved the claims between the parties.

## F. Foreclosure Settlement

The foreclosure action was ultimately settled through a forbearance agreement with the Borrower and the guarantors, which provided for entry of a stipulated foreclosure final judgment to be sold at a high-bid sale. The final judgment of foreclosure calculates interest at the Loan's standard interest rate of 3.75%. The stipulated judgment was entered on June 17, 2013. The high-bid sale resulted in a total payment to Centennial and Sentinel of $6.5 million. On January 29, 2014, stipulated final summary judgments of deficiency were also entered in the amounts of $1,290,751.89 against the Borrower and the guarantors, but these judgments are uncollectible.

## II. PROCEDURAL HISTORY

On April 23, 2012, Sentinel filed its Complaint in Florida state court against Centennial, asserting a claim for specific performance. As the basis for its claim, Sentinel sought to enforce Section 13 of the Participation Agreement, also known as the Repurchase Clause ("Repurchase Clause" or "Repurchase Option"), alleging a number of defaults by Centennial and its predecessor-in-interest. On May 23, 2012, Centennial removed the case to the United States District Court for the Middle District of Florida based upon the district court's diversity jurisdiction.

Sentinel filed an Amended Complaint, and then a Second Amended Complaint and added allegations based on facts developed in discovery. Centennial then moved to dismiss Sentinel's Second Amended Complaint. While the Second Amended Complaint and the motion to dismiss were pending, Centennial filed a motion for summary judgment as to each of the claims in Sentinel's Second Amended Complaint. The district court granted Centennial's summary judgment motion as to Counts I and II, which were claims alleging breaches by Centennial's predecessor-in-interest, because the court determined that those claims were barred by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). However, the district court denied Centennial's motion as to Count III – the breach of contract claim against Centennial – because the court found FIREEA was inapplicable to the alleged breaches by Centennial itself. Sentinel filed its own motion for summary judgment as to Count III. The district court denied Sentinel's motion as to Count III, concluding that disputed issues of fact precluded summary judgment for Sentinel.

Additional discovery regarding Count III followed, and Sentinel then filed a Third Amended Complaint. Centennial answered and raised a number of affirmative defenses. Centennial also asserted a counterclaim against Sentinel based on Sentinel's alleged breach of the Participation Agreement in failing to pay

8

its pro rata share of loan administration expenses for the loan. Sentinel answered the counterclaim and raised defenses.

In February 2015, the district court held a three-day bench trial on Count III of Sentinel's Third Amended Complaint and Centennial's counterclaim. The district court issued its Memorandum Opinion and Order on October 1, 2015 and ordered that judgment be entered in favor of Centennial on Count III in Sentinel's Third Amended Complaint. The court also ordered that judgment be entered in favor of Centennial on Centennial's counterclaim. The Clerk of Court entered judgment as directed for $24,381.60 in favor of Centennial and assessed $12,366.88 for costs at Centennial's request. Sentinel then filed this appeal.

## III. STANDARD OF REVIEW

On appeal of a district court order from a bench trial, we review the district court's conclusions of law *de novo* and its findings of fact for clear error. *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1319 (11th Cir. 2011). We will not upset a district court's finding of fact unless it is "clearly erroneous." Fed. R. Civ. P. 52(a); *see Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009). By that standard, we may review the district court's findings of fact if, after viewing all the evidence, we are "left with the definite and firm conviction that a mistake has been committed." *HGI Assocs., Inc. v. Wetmore*

9

*Printing Co.*, 427 F.3d 867, 873 (11th Cir. 2005) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

## IV. DISCUSSION

We agree with the district court that Sentinel failed to establish that Centennial defaulted under the terms of the Participation Agreement, and therefore, Sentinel cannot invoke the Repurchase Clause, or Put Option, set forth in Section 13.

Upon *de novo* review of the district court's conclusions of law, we do not agree with the district court's construction of the Participation Agreement to the extent that the district court found Sentinel was required to prove that it had incurred a loss due to the Originating Bank's lack of commercially reasonable conduct, negligence, or willful misconduct as a predicate for enforcement of the Repurchase Option provided for in Section 13. We also do not agree that Section 10 is inapplicable post-default insofar as it requires Centennial, in its reasonable judgment, to keep Sentinel fully informed as to any and all information that it has or receives relating to the Loan, the value of the collateral securing the Loan, and the Borrower.

However, in applying our construction of the relevant provisions, we reach the same ultimate conclusion as the district court that Sentinel failed to prove a

breach sufficient to trigger the Repurchase Option in Section 13.  Therefore, and for the reasons stated herein, the district court's ruling will be affirmed.

1. **The District Court Erred in its Construction of the Participation Agreement.**

On appeal, Sentinel argues that the district court erred in its construction of Sections 4, 10, 11, 13, and 16 of the Participation Agreement.  Specifically, Sentinel argues that the district court erred in refusing to enforce the Repurchase Option because it erred in concluding that: (1) Sections 4, 10, and 11 did not require Centennial to convey every piece of information that it had or received relating to the Loan or the Borrower; and (2) Section 16 did not allow Sentinel to control the course of conduct by requiring Centennial to employ the default interest rate after the Borrower's default.  We separately address the relevant provisions of the Agreement.

A. Section 13 of the Participation Agreement

Because Sentinel ultimately seeks to enforce the Repurchase Clause set forth in Section 13, we begin our analysis with this provision of the Participation Agreement.  Section 13 of the Participation Agreement is entitled, "Breach by Originating Bank," and provides as follows:

> Participating Bank shall, in addition to all other remedies available to it at law or in equity, have the unilateral right (but not the obligation) to sell to Originating Bank, regardless of self-imposed lending limits of Originating Bank, its Participation Interest up to the amount that Originating Bank is

11

permitted to purchase without violating regulatory lending limit requirements, for an amount equal to the aggregate of all principal, interest, fees and other sums due with respect to its Participation Interest or the portion that is being sold, if:

> a. Originating Bank shall fail to cure any default by the Originating Bank under this Agreement within thirty (30) days after notice from Participating Bank specifying the default[.]

Under the terms of the Agreement, before Sentinel is permitted to invoke the Repurchase Clause in Section 13, Sentinel must establish: (1) Centennial committed a "default" under the terms of the Participation Agreement; and (2) Sentinel provided notice to Centennial of this "default," which Centennial failed to cure within thirty (30) days of receiving such notice.[2]

As the district court observed, the term "default" is not expressly defined within this section, or within any other section of the Agreement. Under Georgia law, "the whole contract should be looked to in arriving at the construction of any part." O.C.G.A. § 13-2-2(4). Therefore, we must construe the Participation Agreement as a whole to ascertain the duties that Centennial, as the Originating Bank, owed to Sentinel, as the Participating Bank.

---

[2] Because we do not find that Centennial committed a default under the terms of the Participation Agreement, our analysis throughout this opinion does not consider whether Sentinel provided adequate notice to Centennial, which is a condition precedent that must be satisfied prior to invoking Section 13.

12

B.  Sections 4, 10, and 11 of the Participation Agreement

Sentinel insists that in reading Sections 4, 10, and 11 together, the parties intended for Centennial to be completely open in communications with Sentinel, and Centennial was prohibited from withholding any information from Sentinel that related to the Loan, the collateral, and the Borrower, and that its failure to observe this standard is a breach allowing it to exercise the Repurchase Option in Section 13.

In support of its position, Sentinel heavily relies upon the Middle District of Georgia's decision in *Sun American Bank v. Fairfield Financial Services*, 690 F. Supp. 2d 1342 (M.D. Ga. 2010), where the district court analyzed provisions in a loan participation agreement identical to those in this case and concluded the originating bank was required to keep the participating bank fully informed of all matters relating to the loan, the value of the collateral securing the loan, and the borrower.

In this case, the district court did not directly address Sections 4 and 11 of the Agreement in its order; but the court did conclude that Centennial was required to comply with Section 10.  The court further found that Section 10 only applies up until the time the Borrower defaults.  The district court concluded Centennial was no longer required to convey pertinent information to Sentinel once the Borrower defaulted on the Loan.

13

On appeal, Sentinel argues the district court's analysis was incomplete because it failed to address or give any weight to Sections 4 and 11 prior to reaching its conclusion that Centennial did not owe a duty to Sentinel pursuant to Section 10 to convey every piece of information relating to the Loan, the collateral, or the Borrower. Sentinel complains the district court's analysis was contrary to the district court's analysis in *Sun American*, which construed Sections 4, 10, and 11 as a whole. Sentinel further insists that the district court erred in determining that Centennial was no longer required by Section 10 to inform Sentinel about settlement offers from the Borrower or third parties after the Borrower defaulted.

We agree with the district court's finding that Sections 4 and 11 are not directly applicable to the claims made in this case. However, we consider Sections 4 and 11 to be relevant to the proper construction of Section 10, and for that matter, the entire Agreement. We also do not agree that Section 10 only required Centennial to convey information prior to the Borrower's default. And, we find the facts of *Sun American* are distinguishable from the facts of this case.

  i. *Sections 4 and 11 of the Agreement*

Section 4 is entitled "Credit Condition of the Borrower(s): Access to Credit Information," and states,

> It is understood and agreed that Participating Bank, and not Originating Bank, is responsible for making the ultimate credit decision through the Participating Bank's own review of information pertaining to the Loan. Consequently, credit

14

evaluation performed by Originating Bank must be independently verified and supplemented by Participating Bank's review of individual Borrower(s) information with respect to each Loan, sufficient for Participating Bank to make its own credit decision with respect to its purchase of a Participation Interest in the Loan and to monitor the Loan on an ongoing basis.  In the event Originating Bank decides to terminate its credit relationship with a Borrower, or materially downgrades its relationship with a Borrower, Originating Bank promptly will provide written notice of such determination to Participation Bank.

Section 11 is entitled "Files and Records," and provides, in pertinent part, as follows:

Originating Bank shall keep and maintain at its offices, such files and records of matters pertaining to the Loan, including all such documentation, actions, and information as is set forth in Participating Bank's commitment letter, if any, which is expressly incorporated by reference herein, as it would were the Loan made solely by Originating Bank.  All such files and records shall be available for inspection by Participating Bank or its agent during normal business hours.

Sections 4 and 11 do not have any direct relevance to this case.  With respect to Section 4, we agree with Centennial that this provision placed an affirmative burden on Sentinel, not Centennial, to review every piece of information pertaining to the Loan.  This section only required the Originating Bank to give notice to the Participating Bank if it was terminating or downgrading its credit relationship with the borrower; however, this case does not involve any allegation that Centennial failed to notify Sentinel of a decision to terminate or downgrade its credit

15

relationship with the Borrower.  Therefore, Section 4 does not directly apply to Sentinel's claims.

As for Section 11, this section required Centennial to make certain records available to Sentinel.  Once again, we do not find Centennial had any affirmative obligation in Section 11 to convey every piece of information to Sentinel that it had in its possession or received.  In any event, there is no allegation that Centennial refused Sentinel the right to review files or records pertaining to the Loan.  There is also no allegation that Centennial failed to keep and maintain files or records in accordance with Section 11.  Accordingly, we do not agree with Sentinel that Section 11 imposed an affirmative duty upon Centennial to convey any and all information relating to the Loan or the Borrower, or that Centennial breached Section 11 and is therefore entitled to the enforcement of the Repurchase Option.

However, we do agree with Sentinel that Section 10 should be construed in light of the intent of the original parties that the Participating Bank be privy to sufficient information to be the master of its credit risk.  The problem here is that the loan was known to be substandard and in foreclosure when Sentinel acquired its majority interest.

     *ii.    Section 10 of the Agreement*

Section 10, entitled "Default by Borrower," states,

> Originating Bank shall promptly, after Originating Bank's having knowledge thereof, inform Participating Bank of any circumstances (a "default") which in Originating Bank's reasonable judgment: (a) constitute a material default under the Loan Documents and of the salient facts known to Originating Bank concerning such default; or (b) could have a material, adverse affect [sic] on the loan or the value of the Collateral securing the Loan.

Section 10 further reads, "Originating Bank shall keep Participating Bank fully informed with respect to such circumstances, and any actions taken by Originating Bank in connection therewith."

In interpreting Section 10, the district court determined that this section imposes the following two obligations: (1) the Originating Bank must inform the Participating Bank of any circumstances which, in the Originating Bank's reasonable judgment, constitute a "material default" under the Loan Documents along with the facts known to the Originating Bank; and (2) the Originating Bank must inform the Participating Bank of information relative to the Borrower which, in the Originating Bank's reasonable judgment, may pose a material, adverse effect on the Loan or the value of the collateral.

We agree with the district court's finding that because Sentinel was aware the Loan was in default when it acquired its interest in the Participation Agreement on May 26, 2011, the only part of this section relevant to the issues in dispute was Centennial's duty to promptly inform Sentinel of circumstances which in Centennial's "reasonable judgment . . . could have a material, adverse affect [sic

17

on the loan or the value of the Collateral securing the loan." Thus, under the terms of Section 10, Centennial was only obligated to convey information to Sentinel, which in its reasonable judgment, may have had a material, adverse effect on the Loan, the value of the collateral securing the Loan, or the Borrower.

We conclude the district court went one step too far in its analysis, however, when it determined Section 10 only applied to pre-default conduct, and once the Borrower defaulted on the Loan, the Originating Bank was not required to provide additional information that might have a material, adverse effect on the Loan or the value of the collateral securing the Loan. The Agreement simply does not support such a construction in the event of, for instance, a post-default loan modification.

Thus, in reading the last sentence of Section 10, we find that under some conditions, Centennial had a continuing obligation to keep Sentinel fully informed of any subsequent circumstances and any actions relevant to the Borrower's default on the Loan. That is not to say that Centennial's continuing obligation was without limits, however. In complying with its continuing obligation, Centennial was still permitted to use its "reasonable judgment" when conveying information to Sentinel, and Centennial was only required to convey such information if, in Centennial's reasonable judgment, it was capable of having a "material, adverse effect" on the Loan or the collateral securing the Loan.

iii.    *Sun American is not Applicable to the Facts of this Case.*

Sentinel insists that a reading of *Sun American Bank v. Fairfield Financial Services*, 690 F. Supp. 2d 1342 (M.D. Fla. 2010) supports its construction that Centennial was required by Sections 4, 10, and 11 to inform Sentinel and its predecessors-in-interest of any and all information relative to the Loan and that its failure to do so requires the enforcement of the Repurchase Clause in Section 13. In its order, the district court considered Sentinel's citation to and reliance upon *Sun American*. In one paragraph, the court concluded that *Sun American* was not analogous to the instant case because *Sun American* involved an originating bank's default under Section 10 when it failed to inform the Participating Bank of a downgrade in the borrower's credit rating at a time when the Participating Bank may have been able to back out of the deal. We agree with the district court's distinction, but we more fully set out our reasoning below.

Similar to this case, *Sun American* involved an action alleging a breach of a participation agreement due to an originating bank's failure to convey information that related to the status of an underlying loan to a participating bank. 690 F. Supp. 2d at 1344. Specifically, it was alleged that the originating bank failed: (1) to convey information relating to changes in the borrower's credit status, under section 4 of the participation agreement; (2) to convey circumstances that may have had a material, adverse effect on the loan, under section 10 of the

19

participation agreement; and (3) to make its loan file available to the participating bank, under section 11 of the participation agreement. *Id.* at 1346-1347.

It is clear from *Sun American* that the originating bank was engaging in deceptive conduct to ensure that the participant would remain committed to the loan. *Id.* at 1361. The loan at issue called for the total sum to be disbursed to the borrower in installments over time; therefore, it was highly material that the adverse information was withheld from the participating bank until the final installment was paid. *Id.* at 1344. And, the evidence showed that the originating bank had intentionally withheld information relevant to the borrower's creditworthiness before all of the draws were funded in order to induce the participating bank to continue making advances on the loan. *Id.* at 1367.

At the summary judgment stage, the participating bank established that had the information been conveyed by the originating bank, the participant would not have entered the participation agreement in the first place; may not have funded future construction draws; may have insisted on additional collateral; may have required that future construction draws were drawn directed by vendors; and/or may have prevented the originating bank from making a new loan to the borrower. *Id.* Based upon these facts, the district court enforced the repurchase clause of the participation agreement. *Id.*

20

The participant in *Sun American* acquired its interest prior to a default, and continued to make advances on the loan in reliance on the creditworthiness of the borrower because the originating bank failed to convey material, adverse information. *Id.* at 1367. As the district court in this case correctly emphasized, the failure to convey information in *Sun American* occurred "at a time when the Participating Bank could have backed out of the deal." Here, however, there is no evidence that Centennial engaged in deceptive conduct or attempted to mislead Sentinel or its predecessors-in-interest before or after the Borrower's default. The Loan was nonperforming at the time the offers discussed below were received, and as explained herein, it cannot be said that any of the offers would have had a "material, adverse effect" on the Loan.

C. Section 16 of the Participation Agreement

Sentinel further argues that it is entitled to the enforcement of the Repurchase Option in Section 13 because Centennial breached Section 16, which in subsection (b), required Centennial to consult Sentinel and have Sentinel consent in writing before Centennial made or consented to any modification, amendment, or termination of any material term or condition of the Loan documents, including the post-default interest rate. Further, according to Sentinel, once Centennial became aware of the Borrower's default, Centennial was required by Section 16(e) to notify and consult with Sentinel to agree on a course of action.

21

Sentinel argues that once Centennial and Sentinel failed to agree on a course of action, Centennial breached Section 16(e), pursuant to which Sentinel, as the majority interest holder, should have had the sole right to control the course of action.

In analyzing Section 16, the district court concluded that Section 16(e)'s meet-and-confer requirement was a one-time event, which was triggered upon the Borrower's initial default of the Loan. The court reasoned that "[t]his section does not allow a Participating Bank who sits on its hands for ten days to later dictate the course of action to be undertaken by the Originating Bank." In addition, the district court determined that any breach of the Participation Agreement by Centennial was limited by Section 16(d), which would allow Sentinel to recover only for damages or exercise the Repurchase Option in the event it could prove it sustained losses due to Centennial's lack of commercially reasonable conduct, negligence, or willful misconduct. Therefore, the court found the limitation on liability in Section 16(d) also extended to any breach of Section 10.

We disagree with the district court's construction of Section 16 to the extent that it concluded: (1) the "meet-and-confer" requirement necessarily addressed the initial default only; and (2) the limitation of liability in Section 16(d) is a limitation on the circumstances under which Sentinel is entitled to exercise the Repurchase

22

Option.  Nonetheless, we affirm the district court because Sentinel failed to establish a breach as required by Section 13.

    *i.*    *Section 16(b): Consult and Obtain Written Consent*

Section 16 is entitled, "Administration of Loan" and sets forth Centennial's obligations as the Originating Bank in administering the loan and in the event of a Borrower's default.  Section 16(b) states,

> Participating Bank shall, in all events be consulted and must consent, in writing, for Originating Bank to: (i) make or consent to any modification, amendment, or termination of any of the material terms or conditions of the Loan Documents (without limiting the foregoing, a "material" term includes the interest rate, the specific collateral pledged, guaranties made, scheduled term and maturity date, required covenants, and like provisions)[.]

As the district court correctly noted in analyzing Section 16(b), Centennial was required to consult and obtain Sentinel's written consent before undertaking certain conduct, such as modifying, amending, or terminating any of the material terms or conditions of the Loan documents, including the interest rate.  Thus, in determining whether Centennial breached its duty under Section 16(b), as discussed below, the question is whether Centennial intended to "modify, amend, or terminate" the interest rate.

    *ii.*    *Section 16(e): Meet and Confer*

Section 16(e) states,

23

> Upon becoming actually aware of a default by Borrower(s) under any of the Loan Documents or with respect to the Collateral, or any event which, with the giving of notice or passage of time or both, would constitute a default thereunder, Originating Bank immediately shall notify Participating Bank of such default or event, and Originating Bank and Participating Bank shall mutually agree upon a course of action within ten (10) business days. If, within ten (10) business days a mutually agreeable course of action can not be decided, then, so long as either: (i) the Participation Interest, together with any other interests held by other participants in agreement with the course of action proposed by Participant, equals or exceeds a majority of the then outstanding principal balance of the Loan, or (ii) the Participating Bank holds any Participation Interest as a result of the Originating Bank's inability to purchase that retained portion of the Participation Interest due to regulatory lending limits considerations as provided in paragraph 13 above, the decision of the Participating Bank shall control.

The district court found Section 16(e) provided one opportunity to "meet and confer" regarding an agreed course of action following the Borrower's default. The court acknowledged that if the parties had modified the terms of the Loan post-default, and the Borrower again defaulted, then Section 16(e) would have provided the parties with an opportunity to amicably determine the course of conduct relative to that particular default. However, the court determined that in the absence of a modification, the language of Section 16(e) expressly required the meet and confer to take place within ten (10) days of the parties becoming aware of the Borrower's initial default. In reaching this conclusion, the district court

rejected Sentinel's position that a ten-day "meet and confer" was required by Section 16(e) every time some activity occurred relative to the Loan.

We disagree with the district court's construction of Section 16(e), in part. As Sentinel correctly argued on appeal, the district court's reasoning is flawed because under the terms of the Agreement, the Borrower can technically default every month that a payment is missed, every time a principal payment is missed, and for every tax bill that goes unpaid. In applying the district court's reasoning, the majority owner of the Loan would be stripped of the opportunity to ever control the course of action after the Borrower's first initial default. From then on, the minority owner and servicer would be able to make decisions without consulting the majority owner, without any regard to changed circumstances, and without any regard for the majority owner's economic interests.

Nonetheless, Sentinel was still required to identify the specific "default" by the Borrower that triggered the ten-day "meet-and-confer" requirement, and Sentinel was still required to prove that it timely exercised its right to "meet and confer" in good faith in order to establish a breach of Section 16(e).

### iii.    *Section 16(d): Limitation of Liability*

Section 16(d) contains a limitation of liability clause, which limits the Originating Bank's liability as follows:

> Originating Bank agrees to exercise the same degree of care in administering Participating Bank's Participation Interest in the

25

Loan that Originating Bank, customarily exercises in handling similar loans for its own account; however, Originating Bank shall be liable to Participating Bank only for losses due to Originating Bank's lack of commercially reasonable conduct, negligence, or willful misconduct.

The district court concluded that if Centennial breached any of its Section 16 duties, such as by modifying the loan without the Participating Bank's consent or failing to "meet and confer" in the event of the Borrower's default, Sentinel was without a remedy unless Sentinel could prove that it incurred a loss due to Centennial's commercially unreasonable conduct, negligence, or willful misconduct. The district court further concluded that because the term "default" is undefined throughout the Participation Agreement, the term should be given the same meaning throughout the Agreement, and therefore, Sentinel could not exercise its Repurchase Option in the event of any breach without proof of a loss due to Centennial's commercially unreasonable conduct, negligence, or willful misconduct.

We agree with the district court that insofar as the duties related to loan administration set forth in Section 16 are concerned, Sentinel lacks any remedy in the absence of a proof of loss attribute to Centennial's misconduct. Through its structure and plain language, the Agreement clearly provides so.

We disagree, however, that the limitation of liability in Section 16(d) restricts the enforcement of the Repurchase Option for breaches unrelated to loan

26

administration.  The Participation Agreement imposes numerous duties on the Originating Bank apart from its responsibility for loan administration.  Certain of those duties are concerned with the ability of the Participating Bank to manage its credit risk and therefore require the Originating Bank to exercise reasonable judgment in disclosing material, adverse information regarding the Borrower to the Participating Bank on an ongoing basis.  And because, as between the Participating Bank and the Originating Bank, the Participating Bank has the greatest financial exposure and the least access to information, Section 13 makes clear that in the event of a material breach of such duties, the Participating Bank can shift the risk back to the Originating Bank regardless of a demonstrable loss by exercising the Repurchase Option, that option is "in addition to all other remedies available to it at law or in equity."

### 2.  Centennial did not Default under the Terms of the Agreement.

We now turn to consider Sentinel's alleged defaults within the context of the construction of the Participation Agreement set forth above.

At trial and on appeal, Sentinel argues that Centennial defaulted in the following ways: (1) in failing to keep Sentinel fully informed about the Loan, the value of the collateral securing the Loan, and the Borrower; and (2) in defaulting on its obligation to follow Sentinel's directives regarding the course of action against the Borrower. Specifically, Sentinel argues that Centennial concealed third-

27

party offers to buy the Loan, concealed the Borrower's post-default settlement offers, and refused to abide by Sentinel's directives to apply the Loan's "default interest rate" against the Borrower after the Borrower defaulted.

A. Failure to Convey Offers by the Borrower and Third Parties

Sentinel insists that Centennial had an obligation pursuant to Sections 4, 10, and 11 of the Participation Agreement to convey to Sentinel every piece of information that Centennial received or possessed relating to the Loan. As addressed above, we do not find Sections 4 and 11 are directly applicable to this case; therefore, we will consider Sections 4 and 11 only to the extent they bear on the issue of whether Centennial's failure to convey the settlement offers by the Borrower and third parties violated Section 10.

i. *Offers by the Borrower*

Sentinel argues that Centennial violated Section 10 when Centennial failed to convey a settlement offer that it received from the Borrower to Sentinel's predecessor-in-interest in November 2010. The district court ruled that Sentinel failed to establish by a preponderance of the evidence that the offer by the Borrower in November 2010 was not communicated to the Participating Bank, which at the time was Sentinel's predecessor-in-interest. At trial, the precise terms of the Borrower's offer were not disclosed, and aside from ambiguous testimony given by Centennial's Vice President of Special Asset Department, there was no

28

testimony that the offer was not communicated.  We have no basis to disturb this finding.

We also agree with the district court that there is nothing in the record to suggest Centennial failed to use its reasonable judgment in deciding whether to communicate such an offer to Sentinel.  It is undisputed that the Loan was already in default at the time Centennial received the November 2010 offer from the Borrower.   As testified to by Centennial's Vice President of Special Asset Department at trial, Centennial would not forward offers to Sentinel unless Centennial deemed those offers to be "viable."  While Sentinel may disagree with Centennial's decision, Centennial was permitted by the plain language of Section 10 to use its "reasonable judgment" in deciding what information should be conveyed to Sentinel, and Sentinel did not show that Centennial failed to use its reasonable judgment in doing so.

Moreover, there is nothing in the record to establish how this offer may have had a material, adverse effect on the Loan or the value of the collateral securing the Loan, as is required by the language of Section 10.   Aside from a conclusory argument that "[o]ffers to buy the note . . . are critically important because when a loan is nonperforming, the primary goal is to minimize risk exposure," Sentinel fails to establish how the November 2010 offer would have amounted to a "material, adverse effect on the Loan or the value of the collateral" in light of the

29

fact that no payment had ever been made on the Loan, the Loan had been in default for nearly two years, and foreclosure proceedings were pending.

Sentinel also argues that Centennial's failure to inform Sentinel of the deed in lieu of foreclosure offered by the Borrower and failure to invite Sentinel to mediation amounted to a violation of Section 10. Centennial admitted that it rejected the Borrower's offers without seeking the Participant's approval. Centennial further admitted that it did not invite Sentinel to participate at mediation, and it failed to inform Sentinel of the offers that it received and rejected at mediation.

We agree with the district court that Centennial's failure to convey the offer of the deed in lieu of foreclosure and failure to invite Sentinel to participate at mediation are not defaults under the terms of the Participation Agreement. There is simply nothing in the record to establish that Centennial failed to use its reasonable judgment in making such determinations. Similarly, there is nothing in the record to substantiate that the Borrower's offer of a deed in lieu of foreclosure and any offers received at mediation had or could have a "material, adverse" effect on a non-performing Loan. To the contrary, it is undisputed that the Ocoee Golf Development ultimately sold at a foreclosure sale for $6.5 million, and the highest third-party offer prior to the foreclosure sale was $3.8 million as the district court pointed out. Any offer whatsoever on a non-performing loan would prove to have

at least somewhat of a positive effect on the Loan, as opposed to a material, adverse effect.

However, we do not agree with the district court's finding that even assuming Centennial failed to convey any of the Borrower's offers to Sentinel's predecessor-in-interest, Sentinel's argument would still fail because it did not sustain a loss as defined in Section 16(d). As addressed above, it is not necessary for Sentinel to prove Centennial sustained a loss as defined in Section 16(d) prior to invoking the Repurchase Option in Section 13.

In reaching our conclusion that Centennial did not default under Section 10 when it failed to disclose the Borrower's offers and failed to invite Sentinel to mediation, we construed Section 4, 10, and 11 as a whole. However, we do not find that the parties' intent underlying Sections 4 and 11 – that the Participating Bank have sufficient information to make decisions concerning its credit risk – alters our conclusion. Under Georgia law, "[t]he cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced[.]" O.C.G.A. § 13-2-3. Here, Sentinel was already privy to the potential risks that it might encounter because at the time it acquired its majority interest, the Loan was already non-performing and in foreclosure. We therefore cannot agree

31

with Sentinel that our consideration of Sections 4, 10, and 11 together conflicts with the district court's finding.

### ii.     Third-Party Offers

The record is undisputed that Centennial received third-party offers to purchase the Loan in May 2010 for $3.8 million, in July 2010 for $3.5 million, and in July 2011 for $3.8 million. It is also undisputed that these offers were not conveyed to Sentinel. The district court ruled that under the express terms of the Participation Agreement, Section 10 did not require Centennial to communicate these offers to Sentinel. The district court then turned to Section 16(d) and found that Sentinel's argument failed because it was unable to establish that it sustained a loss under section 16(d) due to the failure of Centennial to convey this offer, or any other offer for that matter.

As stated, we do not believe that the limitation of liability set forth in Section 16(d) applies to the analysis under Section 10. However, as with the foregoing offers that were not communicated to Sentinel, we believe the record lacks any evidence that Centennial failed to use reasonable judgment when it chose not to convey these offers. Sentinel also failed to establish that such offers may have had a "material, adverse effect" on the Loan and/or the collateral.

For the same reasons addressed above, we do not find that our construction of Sections 4, 10, and 11 together alter our conclusion.

32

B. Sentinel's Right to Control the Course of Action

On appeal, Sentinel contends that the district court erred in concluding Sentinel did not have the right as the majority owner to dictate the application of the default interest rate after the Borrower's initial default and after the commencement of the foreclosure proceedings.  Sentinel argues that 16(b) and 16(e) together provided Sentinel with the rights to be consulted, to control the course of action, and to make decisions regarding material items such as interest rates, foreclosure and modification of the Loan.  Therefore, when Centennial refused Sentinel's directive to set the Loan interest rate at the default interest rate of 25%, rather than the standard interest rate of 3.75%, Sentinel insists that Centennial materially breached this provision of the Participation Agreement and that this breach triggered its rights under Section 13's Repurchase Option.

The district court recognized that Centennial unilaterally elected to obtain a final judgment using the 3.75% standard interest rate, as opposed to the 25% default interest rate, over the objection of Sentinel in violation of Section 16(b).  However, in considering the limitation on liability set forth in Section 16(d), the court found the element of "loss" was lacking relative to the failure to utilize the 25% interest rate because the evidence was undisputed that any deficiency judgment against the Borrower and the guarantors was uncollectable.  Because a default consists of conduct, which violates a duty imposed under Section 16(b),

coupled with a loss pursuant to Section 16(d), there was no "default" to trigger the Repurchase Option under the facts of this case.

As an initial matter, we take issue with the district court's finding that Centennial violated Section 16(b). Section 16(b) requires Centennial to consult and obtain the written consent of Sentinel prior to any "modification, amendment, or termination" of any "material terms" in the Loan documents. While it is undisputed that in the Final Judgment of Foreclosure, Centennial refused Sentinel's demand that it charge the default interest rate, we fail to see how that amounted to a "modification, amendment or termination." Under the terms of the Loan, whenever the Borrower defaulted, the Note provided "to the extent permitted by law, the Rate of Interest on the unpaid balance shall be increased at Bank's discretion up to the maximum rate allowed by law." While the district court noted that the "Bank" was defined to be both the Participating Bank and the Originating Bank, the record does not support this. Rather, the Loan documents define only Old Southern Bank as the "Bank" in this case. Therefore, it follows that Centennial, as Old Southern Bank's predecessor-in-interest, had the discretion to charge the 25% interest rate, but this was not an obligation. The fact that it exercised its discretion not to charge the 25% cannot be somehow re-characterized as a "modification, amendment, or termination" of the Loan documents, and therefore, we do not find that Centennial violated Section 16(b).

34

Even assuming Centennial violated Section 16(b), we find that Sentinel failed to demonstrate that it had the right pursuant to Section 16(e) to require Centennial to apply the default interest rate.  Sentinel failed to present evidence that its predecessor-in-interest exercised its rights under Section 16(e) after the Borrower defaulted in October 2008, and failed to identify any subsequent default that would have resuscitated the "meet-and-confer" requirement, which are the conditions precedent, which would allow the Participating Bank to control the post-default course of conduct.

Finally, even if Sentinel had proven that Centennial breached Section 16(b), Section 16(b) is part of the Section entitled, "Administration of Loan," and pursuant to Section 16(d), liability for breaches attributable to the loan administration are limited to losses due to the Originating Bank's lack of commercially reasonable conduct, negligence, or willful misconduct.  Because Sentinel's ultimate objective was to exercise the Repurchase Option, it produced no evidence sufficient to satisfy this standard.

### 3. Centennial Prevails on its Counterclaim.

Because we rule in favor of Centennial on its breach of contract claim, we also find in favor of Centennial on its counterclaim.

35

## V. CONCLUSION

For the reasons set forth in this Opinion, we **AFFIRM** the judgment in favor of Centennial.